

**FILED**

Jun 05 2017, 9:31 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

James D. Johnson
Blair M. Gardner
Jackson Kelly PLLC
Evansville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David L. Steiner
Frances Barrow
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Virginia Garwood and Kristen Garwood, <br> *Appellants-Plaintiffs,* <br><br> v. <br><br> State of Indiana, *et al.*, <br> *Appellees-Defendants.* | June 5, 2017 <br><br> Court of Appeals Case No. 31A01-1603-CT-679 <br><br> Appeal from the Harrison Circuit Court <br><br> The Honorable John T. Evans, Judge <br><br> Trial Court Cause No. 31C01-1105-CT-24 |

**Mathias, Judge.**

[1] Mother and daughter Virginia and Kristen Garwood ("Virginia," "Kristen," collectively, "the Garwoods") ran a dog-breeding business from their Harrison County, Indiana, dairy farm. On June 2, 2009, the Indiana Department of Revenue ("DOR"), in concert with the Office of the Indiana Attorney General

("OAG") and the Indiana State Police (collectively, "the State"), raided the Garwoods' farm and seized and immediately sold more than two hundred dogs in partial satisfaction of the Garwoods' unpaid sales and income tax liability.

The Garwoods sued a large number of public and private defendants in Harrison Circuit Court for federal constitutional and state-law torts arising from the raid. The Garwoods found success against only one: Andrew Swain ("Swain") in his personal capacity, then chief counsel for tax litigation in OAG, against whom a Harrison County jury entered a $15,000 verdict. The Garwoods now appeal and seek a new trial. The State cross-appeals and seeks reversal of the judgment against Swain.

We reverse the judgment against Swain as unsupported by sufficient evidence. We affirm the trial court in other respects.

## Facts and Procedural Posture

### I. The Raid of June 2, 2009, and Events Leading to It

Stated in the terms most favorable to the Garwoods and the judgment against Swain, and incorporating a decision of the Indiana Tax Court regarding the principals of this case, the events of and leading to June 2, 2009, may be summarized as follows. In 2007, dairy prices fell, and the Garwoods' dairy farm became less profitable. The Garwoods started breeding dogs for retail sale to make up the lost income. Without malicious intent, they did not register with the Indiana Secretary of State or DOR as retail merchants. They did not collect sales tax on the dog sales or remit sales tax to DOR, and they incompletely or

incorrectly reported their income from the sales. They cared for their dogs properly and sold them responsibly.

[5] In February 2009, the Harrison County animal control officer told Swain he thought the Garwoods' dog-breeding business was unregistered and did not collect or remit sales tax. The officer had received a complaint from one of the Garwoods' alleged customers about a sick dog. Swain relayed the message to OAG's investigations section and asked DOR to investigate the Garwoods' tax status.

[6] It was determined that the Garwoods were in fact selling dogs through advertisements in local newspapers but had not registered as retail merchants or remitted sales tax. OAG investigators incognito purchased two puppies from the Garwoods using funds supplied by the Humane Society of the United States ("the Humane Society"), a private animal-rights organization. Swain had first worked with the Humane Society while pursuing another unregistered, non-remitting dog-breeder for unpaid tax liability. The Garwoods did not collect sales tax on the sale to the investigators.

[7] A meeting was held of staff from DOR, OAG, and the Indiana Office of Management and Budget ("OMB"), the final decision-maker with respect to the State's enforcement actions in this context. Swain and then-Attorney General Greg Zoeller ("Zoeller") advocated or counseled pursuing the same approach used against the other unregistered, non-remitting dog breeder, and against

certain other such businesses: issuing jeopardy assessments and jeopardy tax warrants in conjunction with criminal prosecution for tax crimes.

[8] A jeopardy assessment, as summarized by Swain,

> is an extraordinary tax remedy. Normally when . . . [DOR] . . . says that you owe tax, . . . what's called a proposed assessment [is issued. The proposed assessment may go through several stages of administrative and judicial review before it becomes a final, collectible judgment.] . . . What a jeopardy assessment is designed to do is that if various criteria are satisfied to the Commissioner's satisfaction, [DOR] . . . can issue an immediate tax warrant that turns automatically into a tax judgment which is immediately collectible.

Tr. pp. 283-84. In particular, Swain's interpretation of the jeopardy assessment statute's criteria hinged on the argument that the Garwoods' failure to register, collect, and remit in itself constituted an "act that would jeopardize the collection of . . . taxes." Ind. Code § 6-8.1-5-3. The Garwoods' conduct did not satisfy the jeopardy assessment criteria, as our tax court would later hold, and Swain's and DOR's interpretation of the statute was in excess of their authority. Nevertheless, before the tax court so held, drawing in part on his experience in the Garwoods' case, Swain would later author an article for a state tax law publication, "Tax Ills Behind the Mills[1] — The Advancement of Puppy Protection," Ex. Vol. I, Pls.'s Ex. 2, about "combatting puppy mills" and other

---

[1] "Mills" refers to "puppy mills," a pejorative term for large-scale commercial dog-breeders perceived to run industrialized operations with little regard for the welfare of the animals sold or the consumers buying them.

participants in the unregistered, non-remitting "underground economy" with "civil and criminal tax enforcement techniques." *Id.* He would also later give a presentation to the animal law section of the Indiana State Bar Association on the same topic.

[9] The State's investigation prior to this extraordinary enforcement action was not as thorough as it could have been and gave the Garwoods little or no benefit of the doubt. In estimating the Garwoods' tax liability by the "Best Information Available" ("BIA") assessment procedure, DOR staff used the least conservative estimate of the Garwoods' sales and income, and assessed the maximum penalty for delinquency. The State never sought the Garwoods' co-operation with its investigation.

[10] DOR and OAG arrived at the Garwoods' farm early on the morning of June 2, 2009, and demanded payment of the assessed liabilities. When the Garwoods said they could or would not pay, State officers seized around 240 dogs, including several family pets, in a dramatically staged raid involving a large media presence, a state legislator, and a group of volunteers enlisted and directed by the Humane Societies of the United States and of Missouri. The dogs were sold to the Humane Society the next day for $300, less than $2 per dog, a negligible amount relative to the nearly $300,000 figure alleged by DOR as the Garwoods' outstanding tax liability.

[11] Zoeller trumpeted the success of the raid, giving several media interviews and congratulating his staff and DOR for closing an alleged "puppy mill." That

evening, Swain and two OAG law student interns met Zoeller for a celebratory toast at a hotel in nearby Louisville, Kentucky. Zoeller and Swain would later be honored by the Humane Society in Washington, D.C., for their work.

## II. Proceedings in Harrison Circuit Court

[12]  On June 2, 2009, the morning of the raid, a DOR investigator presented the jeopardy assessments to the Garwoods, Ex. Vol. II, Defs.'s Ex. B., pp. 312-27, and demanded immediate payment of the amounts assessed. When the Garwoods said they could or would not pay, jeopardy tax warrants[2] in those amounts were filed in Harrison Circuit Court, *id.* pp. 328-337, and then presented to the Garwoods before seizure of the dogs. Tr. p. 296.

[13]  The same day, DOR petitioned Harrison Circuit Court for temporary and permanent restraining orders and an injunction against the Garwoods continuing to do business in the state. *See* I.C. § 6-8.1-8-5 (authorizing such orders). On June 4, 2009, DOR and the Garwoods entered an agreed order in the circuit court stipulating that the Garwoods "ha[d] done a cash-and-carry business of selling dogs at retail" without reporting their income from that

---

[2] A tax warrant is an instrument issued by DOR authorizing its agents under certain circumstances to "levy upon and sell" a taxpayer's property immediately without further judicial process. I.C. § 6-8.1-8-8(3) (general tax warrants); *id.* § 5-3(c) (jeopardy tax warrants); *see generally Etzler v. Ind. Dep't of State Revenue*, 27 N.E.3d 1085, 1087–88 (Ind. Ct. App. 2015) (describing operation of tax warrants), *aff'd on reh'g*, 43 N.E.2d 250 (2015). When a tax warrant is filed with a circuit court, it gives rise to a judgment of that court against the taxpayer and a lien in the state's favor on all the taxpayer's property in the county. I.C. § 6-8.1-8-2(e); *State ex rel. Ind. Dep't of Revenue v. Deaton*, 755 N.E.2d 568, 572 (Ind. 2001). "[U]nless and until [DOR's final determination of tax liability as embodied in the tax warrant] is appealed to the Tax Court," the circuit court in which the tax warrant is filed acquires "jurisdiction for the limited purposes of enforcing the judgment" created by the filing. *Deaton*, 755 N.E.2d at 572.

business, collecting or remitting sales tax on the dog sales, or registering as retail merchants. Ex. Vol. II, Defs.'s Ex. F, p. 353. The parties further stipulated that the Garwoods' "unlawful acts ha[d] made it prejudicially difficult" for DOR to collect the taxes owed by them and that the injunction should therefore issue. *Id.* The injunction was issued accordingly.

[14] On June 8, 2009, DOR filed in the circuit court a petition for proceedings supplemental, presumably to collect on the outstanding balance of the judgment created by the tax warrants. *See* I.C. § 6-8.1-8-8.5(b) (authorizing DOR to initiate); Ind. Trial Rule 69(E) ("Proceedings supplemental to execution"). Soon after, *see infra* Part IV, the Garwoods sought judicial review of the jeopardy assessments in the tax court and petitioned that court to enjoin further collection efforts by DOR. *See* I.C. § 33-26-6-2 (authorizing such injunction). On August 12, 2009, Harrison Circuit Court enjoined DOR from collecting on the judgment pending the Garwoods' tax court appeal.

[15] The complaint in the instant case was filed in the circuit court on May 16, 2011, the procedural history of which is detailed below. *See infra* Part V.

### III. Proceedings in Marion Superior Court

[16] On May 29, 2009, three days before the raid, the OAG sought a search warrant in Marion Superior Court for the Garwoods' property to investigate criminal tax law violations. An investigator from that office submitted a probable cause affidavit detailing the Garwoods' business activities and their failures to pay income and sales tax and to register as retail merchants. Ex. Vol. II, Defs.'s Ex.

C. The warrant issued the same day, authorizing search and seizure of *inter alia* "[a]ny and all . . . canines, or other inventory . . . found." Ex. Vol. I, Pls.'s Ex. 9, p. 81.

[17] On June 22, 2009, the State charged the Garwoods with eight counts of tax evasion by information filed in Marion Superior Court. Ex. Vol. II, Defs.'s Ex. I. On May 18, 2010, Virginia pleaded guilty to Class D felony evasion of income tax and Class D felony failure to remit or collect sales tax; Kristen pleaded guilty to Class D felony evasion of income tax. Both women admitted that the facts contained in the probable cause affidavit and information were true and served as the factual basis for their pleas. Ex. Vol. II, Defs.'s Ex. G, p. 360 (Kristen's plea agreement), Defs.'s Ex. H, p. 364 (Virginia's plea agreement). The Garwoods were sentenced the same day, and their sentences were suspended to probation.[3]

## IV. Proceedings in the Tax Court

[18] On June 10, 2009, the eighth day after the raid and two days after DOR initiated proceedings supplemental in Harrison Circuit Court, the Garwoods

---

[3] Both at trial and on appeal, the Garwoods have sometimes argued in a way contrary to what they admitted in their guilty pleas. *See, e.g.,* Tr. p. 721 (Virginia's testimony she "never" failed to report income from the dog sales). To the extent that the result of their constitutional claims would stand or fall on such arguments, we note that the Garwoods are barred from recovering for acts "whose unlawfulness would render [their] conviction[s] invalid" without having first won favorable termination of the criminal matter. *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994). That is, if the unconstitutionality of the State's acts depends on the Garwoods' actual innocence of the crimes to which they pleaded guilty, the Garwoods cannot recover for those acts under § 1983 without having those convictions first set aside or expunged, which the Garwoods have not done.

protested the jeopardy assessments administratively to DOR and requested a hearing. *See* I.C. § 6-8.1-5-1 (general protest procedure; DOR "shall" hold hearing if requested); *Clifft v. Ind. Dep't of State Revenue*, 660 N.E.2d 310, 317 (Ind. 1995) (protest procedure permits protest of jeopardy assessments); 45 Ind. Admin. Code 15-5-8(c) (same; DOR "may" hold hearing if requested). On June 22, 2009, the same day the Garwoods were charged in Marion Superior Court, DOR by letter "respectfully decline[d] the opportunity to conduct the hearing requested" and pointed the Garwoods to Harrison Circuit Court instead, where, DOR believed, "the relief requested . . . [was] best available." Ex. Vol. I, Pls.'s Ex. 15.

[19] On June 29, 2009, less than three weeks after they lodged their protest, and a week after DOR denied the requested hearing, the Garwoods sought judicial review of the jeopardy assessments in the tax court. On both parties' motion, proceedings were continued until October 20, 2010, when DOR moved to dismiss for lack of subject matter jurisdiction. DOR read *Deaton* incorrectly, *see supra* ¶ 12 note 2, to mean that its jeopardy tax warrants had become final judgments of Harrison Circuit Court and could not be challenged in the tax court. The tax court disagreed. *Garwood v. Ind. Dep't of State Revenue* (*Garwood I*), 939 N.E.2d 1150, 1154 (Ind. T.C. 2010). The tax court held further that the Garwoods' administrative remedies with respect to the jeopardy assessments were exhausted when DOR denied the requested hearing. *Id.* at 1156. DOR sought a writ of mandamus and prohibition from our supreme court to prohibit the tax court from exercising jurisdiction, but that application was unsuccessful.

[20] DOR and the Garwoods each moved for summary judgment. The Garwoods claimed that the jeopardy assessments were invalid because DOR had denied them constitutional due process in refusing to hold the hearing requested. On August 29, 2011, the tax court avoided the constitutional question and held instead that DOR had exceeded its authority under the jeopardy assessment statute. *Garwood v. Ind. Dep't of State Revenue* (*Garwood II*), 953 N.E.2d 682, 684 (Ind. T.C. 2011). The tax court held the Garwoods' mere failure to register, collect, and remit did not in itself rise to an "act that would jeopardize the collection of . . . taxes." *Id.* at 688 (quoting I.C. § 6-8.1-5-3). The court's opinion took a generally dim view of what it characterized as DOR's effort to "wiel[d] the power of jeopardy assessments as a sword to eliminate a socially undesirable activity . . . [rather than] to fill the State's coffers with the tax liabilities the Garwoods purportedly owed." *Id.* at 690. The tax court concluded the jeopardy assessments were "void as a matter of law." *Id.*

[21] DOR sought transfer to our supreme court. On March 16, 2012, transfer was granted but vacated as improvident on May 15, 2012, after briefing and argument. *Ind. Dep't of State Revenue v. Garwood*, 966 N.E.2d 1258 (Ind. 2012) (mem.). That was the end of the jeopardy assessment protest.

[22] On August 29, 2011, ten days after the tax court decided *Garwood II* and declared the jeopardy assessments void, Virginia sought a tax refund from DOR, claiming the dogs seized by DOR were worth far more than her actual tax liability and she was therefore owed the difference: more than $100,000. On May 29, 2012, two weeks after our supreme court vacated its grant of transfer in

*Garwood II*, DOR offered Virginia a little over $100. DOR then issued proposed assessments, the normal mechanism for challenging a taxpayer's self-reported tax liability, *see* I.C. § 6-8.1-51, which Virginia protested. By August 27, 2012, DOR had not ruled on Virginia's new protest, and she appealed for the second time to the tax court.

[23] DOR again moved to dismiss for lack of subject matter jurisdiction and on the basis that the same action, the case before us now, was pending in Harrison Circuit Court. *See* T.R. 12(B)(8). Without explanation, the tax court declined to address DOR's 12(B)(8) claim and instead held that it had jurisdiction and denied DOR's motion to dismiss. *Garwood v. Ind. Dep't of State Revenue* (*Garwood III*), 998 N.E.2d 314, 315 (Ind. T.C. 2013). DOR then moved for summary judgment, claiming that Virginia was actually seeking compensatory damages rather than a tax refund. The tax court saw no barrier to Virginia's "prosecut[ing] her claim for compensatory damages, . . . asserted concurrently with her refund claim," in that forum. *Garwood v. Ind. Dep't of State Revenue* (*Garwood IV*), 24 N.E.3d 548, 551 (Ind. T.C. 2014). The tax court therefore denied DOR's motion and ordered the matter set for trial. *Id.* The outcome of those proceedings does not appear in the record before us or from further decisions of the tax court. The matter was apparently still ongoing at the time of trial in this case. *See, e.g.,* Tr. pp. 124, 861, 893.

## V. Proceedings in This Case

[24] The Garwoods filed their initial complaint in this case in Harrison Circuit Court on May 19, 2011, three months before the tax court's *Garwood II* decision

invalidated the jeopardy assessments. On June 17, 2011, the case was removed to federal district court and then remanded for lack of all defendants' consent on October 11, 2011. *Garwood v. State of Indiana*, No. 4:11-cv-72, 2011 WL 4826998 (S.D. Ind. Oct. 11, 2011).

[25] On July 3, 2012, within two months of our supreme court's decision to vacate transfer in *Garwood II*, the Garwoods filed their second amended complaint. That complaint pleaded seven claims against fifty-six defendants. The Garwoods alleged the state-law torts of conversion, defamation, and intentional infliction of emotional distress ("IIED"). Under 42 U.S.C. § 1983, the Garwoods alleged denial of procedural due process under the due process clause of the Fourteenth Amendment to the federal constitution, unlawful search and seizure under the Fourth Amendment, and selective enforcement under the equal protection clause of the Fourteenth Amendment. Finally, under 42 U.S.C. § 1985, the Garwoods alleged conspiracy to violate their civil rights.

[26] These claims were brought against numerous employees of DOR and OAG, Zoeller himself, the state legislator, and state police officers, all in their personal and official capacities, as well as the state police and the State of Indiana ("the State defendants"); the Harrison County animal control officer and the county itself ("the County defendants"); employees of the Humane Societies of the United States and Missouri, and the organizations themselves ("the Humane Society defendants"); and several private parties ("the Private defendants").

By January 2015, several State defendants and most or all the Humane Society, County, and Private defendants had been dismissed by agreement of the parties, and the remaining State defendants moved for summary judgment. The State argued the Fourth Amendment, procedural due process, equal protection, and conspiracy claims failed; the defendants were entitled to official immunity in their personal capacities and not subject to suit in their official capacities; and the tax court had exclusive jurisdiction over the subject matter of the suit. Appellee's App. pp. 2-41. On January 29, 2015, the trial court entered judgment as a matter of law in favor of the State on the § 1985 conspiracy claim, the defamation claim, and all official capacity claims under § 1983. The remaining issues were to be tried; the jurisdictional issue was not addressed.

The Garwoods tried their case to a Harrison County jury over six days, February 22, 2016, to February 29, 2016, against eleven State defendants; one was dismissed by agreement during trial. Between summary judgment and trial, the Garwoods appear to have abandoned their Fourth Amendment claim in favor of a substantive due process claim under the Fourteenth Amendment. All over the Garwoods' strident objections, the trial court declined to give preclusive effect to *Garwood II* and admitted only the opinion's clear holding invalidating the jeopardy assessments; admitted the jeopardy assessments; admitted the jeopardy tax warrants; admitted the Garwoods' plea agreements in the criminal case and a transcript of the Garwoods' May 18, 2010, change of plea hearing in Marion Superior Court; and refused the Garwoods' proffered

final instruction that a void judgment is, "from its inception, . . . a complete nullity and without legal effect." Appellant's App. Vol. II, p. 88.

[29] At the close of evidence, the State moved for a directed verdict in its favor as to all claims and all defendants. The court took the motion under advisement after briefing and argument, and denied it on February 29, 2016. The jury returned a $15,000 compensatory verdict against Swain, $7,500 each for Virginia and Kristen, for one or more constitutional injuries. The Garwoods' counsel, three lawyers from two firms, petitioned for more than $300,000 in attorneys' fees under 42 U.S.C. § 1988. The court awarded counsel $40,000 in fees plus $4,750 costs for each plaintiff, for a total award of $89,500.

[30] The Garwoods timely appealed. The State cross-appealed. The Garwoods seek a new trial against the same defendants except Swain. The Garwoods claim the trial court abused its discretion by failing to collaterally estop the State to litigate issues decided by the tax court in *Garwood II*, or alternatively by failing to admit the tax court's *Garwood II* decision in its entirety; by failing to exclude the jeopardy assessments or to give an instruction as to their voidness; and by failing to exclude records of the criminal proceedings against them. The Garwoods' lawyers also seek an increase in their fee award under § 1988. On cross-appeal, the State claims that the trial court erred by failing to grant Swain either absolute or qualified immunity, and that the judgment against Swain was unsupported by sufficient evidence.

Before proceeding to the merits of these claims, in light of the importance of the question and its appearance at several junctures of litigation, we first clarify our jurisdiction over them.

## Discussion and Decision

### I. Subject Matter Jurisdiction

We have a duty to investigate our jurisdiction over the subject matter of a case on appeal if it appears doubtful. *Albright v. Pyle*, 637 N.E.2d 1360, 1363 (Ind. Ct. App. 1994). Subject matter jurisdiction is jurisdiction over the general class of actions to which a case belongs. *K.S. v. State*, 849 N.E.2d 538, 542 (Ind. 2006). Such jurisdiction is the power of a court to decide a case. *Austin Lakes Joint Venture v. Avon Utils., Inc.*, 648 N.E.2d 641, 645 (Ind. 1995); *State ex rel. Young v. Noble Cir. Ct.*, 263 Ind. 353, 356, 332 N.E.2d 99, 101 (1975). A court of this state has only such jurisdiction — that is, only such power — as granted to it by statute or our constitution. *State v. Sproles*, 672 N.E.2d 1353, 1356 (Ind. 1996).

Upon review, we lack jurisdiction to the extent the trial court lacked it. *Albright*, 637 N.E.2d at 1364; 4 C.J.S. *Appeal and Error* §§ 50, 76 (2007). By statute, the tax court has exclusive jurisdiction over "original tax appeals." I.C. § 33-26-3-3. An original tax appeal is a case that arises under the tax laws and comes within an appeal from a final determination of a state revenue agency. *Id.* § 1. To the extent the Garwoods' case was an original tax appeal, therefore, the tax court had jurisdiction over it to the exclusion of Harrison Circuit Court and every other court of this state. *See Sproles*, 672 N.E.2d at 1356.

[34] A case arises under the tax laws if it "principally involves collection of a tax or defenses to that collection." *Sproles*, 672 N.E.2d at 1357. Our supreme court has construed the tax court's jurisdictional mandate broadly. *State ex rel. Zoeller v. Aisin USA Mfg., Inc.*, 946 N.E.2d 1148, 1153 (Ind. 2011). This ensures a "single authoritative voice on state tax matters," *Bielski v. Zorn*, 627 N.E.2d 880, 886 (Ind. T.C. 1994), *cited in Sproles*, 672 N.E.2d at 1357 n.13, by "channel[ing] tax disputes to a single specialized tribunal . . . ." *Aisin*, 946 N.E.2d at 1152. A case principally involves tax collection or defenses to it if the taxpayer, on statutory, constitutional, or other grounds, contests or challenges tax liability imposed on her by the tax laws.

[35] In *Sproles*, a taxpayer sought a declaratory judgment in the circuit court invalidating a tax lien on a real property interest filed by DOR for nonpayment of the controlled substances excise tax ("CSET") in conjunction with the State's criminal prosecution of the taxpayer for possessing marijuana. 672 N.E.2d at 1355. The taxpayer claimed that imposition of the tax, following his criminal conviction, violated the federal constitutional prohibition on double jeopardy. *Id.* Our supreme court held the tax court had jurisdiction over the action to exclusion of the circuit court. *Id.* at 1357. This was because the taxpayer's "declaratory relief action squarely challenge[d] the validity of an Indiana tax statute as applied," and "the Legislature intended that all challenges to the tax laws — regardless of the legal theory relied on — be tried in the Tax Court." *Id.*

[36] The shared feature of similar cases directed to or kept within the tax court's jurisdiction was the taxpayers' claim that controlling law prohibited the

imposition of tax liability created by the tax laws. *State ex rel. Att'y Gen. v. Lake Super. Ct.*, 820 N.E.2d 1240 (2005) (rejecting "distinction for [jurisdictional] purposes between a challenge to assessments, whether procedural or substantive, and any other basis to contest a tax" in constitutional challenge to real property assessments); *State v. Costa*, 732 N.E.2d 1224, 1225 (2000) (state constitutional challenge to property tax levy under Health Care for the Indigent program); *Bd. of Tax Comm'rs v. Montgomery*, 730 N.E.2d 680, 686 (2000) (same); *Clifft v. Ind. Dep't of State Revenue*, 660 N.E.2d 310 (1995) (one year before *Sproles*, tax court's jurisdiction unquestioned in challenge to CSET jeopardy assessments grounded on constitutional rights to procedural due process, equal protection, and protection against self-incrimination); *Zayas v. Gregg Appliances, Inc.*, 676 N.E.2d 365 (Ind. Ct. App. 1997) (claim against retailer for allegedly improperly collecting sales tax on delivery fees), *trans. denied*, *discussed in Aisin*, 946 N.E.2d at 1156; *UACC Midwest, Inc. v. Ind. Dep't of State Revenue*, 667 N.E.2d 232 (Ind. T.C. 1996) (claim for tax refund grounded in disagreement over applicable tax rate), *discussed in Aisin*, 946 N.E.2d at 1158. By contrast, liability to DOR because of clerical error leading to unjust enrichment is not tax liability imposed by the tax laws and does not rise under the tax laws. *Aisin*, 946 N.E.2d at 1155.

[37]   Harrison Circuit Court had jurisdiction over the instant case because the Garwoods did not seek to challenge tax liability imposed by the tax laws. We cannot overlook the "fundamental difference" between what the Garwoods sought to recover (damages) and what the Garwoods originally owed DOR

(their tax liability). *Id.* To the Garwoods, it seems, this suit was basically an enforcement action: a trial on damages for injuries proved by the tax court's voiding of the jeopardy assessments in *Garwood II*, now repackaged as state and constitutional torts for a court of general jurisdiction. When the trial court failed to give *Garwood II* preclusive effect, the Garwoods argue on appeal, the Garwoods "*lost the value* of the [tax court's] decision . . . ." Appellant's Reply Br. at 7 (emphasis added). As the Garwoods' counsel said in his opening statement after a brief recitation of the State's conduct, "[T]he facts that support all of this are largely undisputed." Tr. p. 151. What was still disputed was how much those facts were worth in damages.

[38] It is true that the Garwoods could have also challenged their tax liability in *Garwood II* by means of the constitutional theories advanced in the instant case,[4] and could have joined any remaining claims, federal and state, in that forum as well.[5] However, such joinder of claims was not mandatory, and lack of it does not impede our review. To the extent that the Garwoods' claims could have

---

[4] One of the Garwoods' three theories of a procedural due process violation at trial — that DOR unconstitutionally denied them a post-deprivation hearing by its June 22, 2009, letter — was in fact asserted before the tax court in *Garwood II* as a basis for invalidating the jeopardy assessments. 953 N.E.2d at 683.

[5] There would have been no barrier at all to joining the Garwoods' § 1983 damages claims, and presumably their state-law tort claims, to their protest action in the tax court. The tax court will entertain § 1983 claims as part of an original tax appeal. *Harlan Sprague Dawley, Inc. v. Ind. Dep't of State Revenue*, 583 N.E.2d 214, 227 (Ind. T.C. 1991), *cited in Garwood IV*, 24 N.E.3d at 551. Indeed, the tax court is the only forum in the country that can. *Nat'l Private Truck Council, Inc. v. Okla. Tax Comm'n*, 515 U.S. 582, 588 (1995) ("Congress did not authorize injunctive or declaratory relief [in state or federal court] under § 1983 in state tax cases where there is an adequate remedy at law."); *Fair Assessment in Real Estate Ass'n v. McNary*, 454 U.S. 100 (1981) (holding federalism and comity prohibit § 1983 damages actions in federal court challenging state taxation as unconstitutional). The tax court will hear claims for damages, as it has announced to the Garwoods themselves. *Garwood IV*, 24 N.E.2d at 550–51.

been brought in the tax court as a basis for tax-law relief, the State might have opposed them here as res judicata. However, it did not.

[39] We conclude that the proper course is to take this case as it came to Harrison Circuit Court via the Garwoods' second amended complaint, filed after the decision in *Garwood II*.[6] The question presented by this case then becomes, assuming the tax-law violation, do that violation and the circumstances surrounding it give rise to tort liability of any kind? Proceeding thusly comports with the legislative purpose declared in *Sproles* and *Aisin*, and with the parties' actual course of litigation. Through the Garwoods' second amended complaint, the invalidation of the jeopardy assessments in *Garwood II* was treated and put to the jury as a fact. *See* Tr. pp. 129-30 (ruling on admissibility).

[40] The settled and limited purpose of the tax court's exclusive jurisdiction is to ensure the uniform interpretation of the tax laws. *Aisin*, 946 N.E.2d at 1152. The tax court has already spoken conclusively to the statutory question at the heart of this litigation in *Garwood II*. Neither the jurisdictional value of finality nor that of validity, *see* Restatement (Second) of Judgments §§ 11 cmt. d, 12 (Am. Law Inst. 1982), would be served by returning this case to the tax court to decide the constitutional and tort-law consequences of its earlier tax-law

---

[6] As described *supra* ¶¶ 24–25, Harrison Circuit Court took no action in this case until the second amended complaint was filed.

holding. The Garwoods' claims were validly asserted in Harrison Circuit Court, and that court's decision is properly and squarely in front of us.

[41] Assured of our jurisdiction on this basis, we proceed to consider the merits of the parties' appeals, beginning with the State's cross-appeal.

## II. *The Judgment Against Swain Was Not Supported by Sufficient Evidence*

[42] Our standard of review on a challenge to the sufficiency of the evidence supporting a jury verdict is the same in civil as in criminal cases. *Auto Liquidation Ctr., Inc. v. Chaca*, 47 N.E.3d 650, 654 (Ind. Ct. App. 2015). We consider only the evidence favorable to the verdict and all reasonable inferences from it. *Id.* We neither weigh the evidence nor judge the credibility of witnesses. *Id.* We will sustain a jury's general verdict on any theory supported by the evidence, reversing only for a total failure of evidence or where the verdict is contrary to the uncontradicted evidence. *Ohio Farmers Ins. Co. v. Ind. Drywall & Acoustics, Inc.*, 970 N.E.2d 674, 686 (Ind. Ct. App. 2012). The decision to grant or deny official immunity is reviewed de novo. *Fields v. Wharrie*, 672 F.3d 505, 510 (7th Cir. 2012) (absolute immunity), *Purvis v. Oest*, 614 F.3d 713, 717 (7th Cir. 2010) (qualified immunity).

[43] Because the Garwoods in reply address only the immunity issue, *see* Appellant's Reply Br. at 16-19 (Swain not entitled to absolute immunity), 19-22 (Swain not entitled to qualified immunity because *state law* clearly established), the State need only show prima facie error on the sufficiency issue, that is, error apparent

"at first sight, on first appearance, or on the face of it." *Trinity Homes, L.L.C. v. Fang*, 848 N.E.2d 1065, 1068 (Ind. 2006).

[44] Though the jury verdict did not identify the theory under which the jury found Swain liable, it could only have been for a constitutional violation under § 1983.[7] Tr. pp. 902-03 (instructing jury that § 1983 claims brought against individual defendants, state-law claims against State of Indiana). Section 1983 supplies a cause of action to anyone deprived of her federal rights by a state actor under color of state law. *Monroe v. Pape*, 365 U.S. 167, 183 (1961). "[I]n any action under § 1983, the first step is to identify the exact contours of the underlying right said to have been violated." *County of Sacramento v. Lewis*, 522 U.S. 833, 841 n.5 (1998) (citation omitted).

[45] This task is more challenging than usual at the appellate stage. Six years of litigation have scarcely narrowed the issues in this case, which is characterized by the Garwoods' continuing failure to relate specific claims to relief to the specific conduct of specific defendants.[8] While we are bound to affirm a general

---

[7] "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or caused to be subjected, any . . . person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983.

[8] Below, the State complained repeatedly that the Garwoods would not enlarge or clarify their complaint allegations, even when asked by interrogatory to do so. Appellee's App. pp. 15, 26-27, 35 (brief in support of summary judgment); *see also* Tr. p. 923 (Garwoods' counsel recoiling at State's sensible suggestion to break down verdict form by claim and defendant). Even in this court, the Garwoods have simply declined to respond to the State's argument on cross-appeal that the trial evidence was insufficient to support § 1983 liability, official immunity notwithstanding, rather than articulate a theory of constitutional injury which would support the judgment below.

verdict on any basis in the record, we are not bound to make counsel's arguments for them, particularly on review for prima facie error. *See Fang*, 848 N.E.2d at 1068 ("[W]e will not undertake the burden of developing an argument on [a litigant's] behalf."). We take guidance from the Garwoods' arguments before the trial judge and, to a lesser degree, from the jury instructions, jury arguments, and complaint allegations.

[46] Concluding that evidence does not make out a claim for any of the constitutional torts alleged, we do not reach the question of official immunity.

### A. Procedural Due Process

[47] The due process clause of the Fourteenth Amendment prohibits this state to "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1, cl. 3. The constitution does not create property interests; it recognizes and protects such interests created by other sources, including state property law. *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). Here, it is undisputed that the Garwoods had a cognizable property interest in their dogs.

[48] The deprivation of a protected property interest "is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest *without due process of law*." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990) (original emphasis, citation omitted). In other words, a due process violation "is not complete when the deprivation occurs; it is not complete unless and until the State fails to provide due process." *Id.* at 126. Due process ordinarily requires

notice and a pre-deprivation hearing. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976). However, a post-deprivation remedy satisfies due process when "either the necessity of quick action by the State or the impracticality of providing any meaningful pre-deprivation process" excuses the state from providing such process. *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), *overruled in other part by Daniels v. Williams*, 474 U.S. 327, 330-31 (1986). Here it is undisputed that the Garwoods did not receive pre-deprivation process; that is, the Garwoods did not receive notice and a hearing before their dogs were seized and sold.

[49] The Garwoods appear to have argued three different theories of a procedural due process violation: first, that the jeopardy assessment statute itself fails to provide a constitutionally required pre-deprivation hearing; second, that DOR unconstitutionally denied the Garwoods a post-deprivation hearing by its June 22, 2009, letter; and third, that, even if the jeopardy assessment statute satisfied due process on its face, the tax court's voiding of the assessments in this case meant "[t]hey literally never happened," Tr. p. 625, and therefore it was as if DOR had never issued them. We address these theories in turn.

[50] Jeopardy assessment schemes were declared constitutional by the United States Supreme Court more than eighty-five years ago. *Phillips v. Comm'r*, 283 U.S. 589, 596-97 (1931), *cited in Parratt*, 451 U.S. at 540 (supporting proposition that necessity of quick action excuses need for pre-deprivation hearing). Indiana's jeopardy assessment scheme has been declared constitutional by our own supreme court. *Clifft v. Ind. Dep't of State Revenue*, 660 N.E.2d 310, 318 (1995) (CSET per se jeopardy assessments) (citing *Phillips*, 283 U.S. at 596–97).

Harrison Circuit Court would not have had jurisdiction to declare otherwise even if not bound by such precedent. Against this background, the Garwoods' first theory cannot have supported the judgment against Swain.

[51] The Garwoods' second theory, that they were unconstitutionally denied a post-deprivation hearing by DOR, fails because the Garwoods received the hearing to which they were entitled in the tax court. The due process clause prohibits this *state* from depriving a person of property without due process, not this state's revenue agencies. The prompt relief available in this state's courts satisfy its obligation to guarantee fair procedure in this context. *Parratt*, 451 U.S. at 544 ("The remedies [for a prison's loss of a prisoner's personal property] provided [by Nebraska's tort claims statute] could have fully compensated the [prisoner's] loss . . . , and we hold that they are sufficient to satisfy the requirements of due process."); *Phillips*, 283 U.S. at 596–97 ("[M]ere postponement of the *judicial enquiry* is not a denial of due process, if the opportunity given for *ultimate judicial determination* of the liability is adequate." (emphasis added)). Indeed, it is a rare plaintiff who claims that only an administrative and not a judicial hearing will satisfy due process. *See, e.g., Ind. Land Co. v. City of Greenwood*, 378 F.3d 705, 711-12 (7th Cir. 2004) (discussing entitlement to judicial review).

[52] So long as the tax court treated DOR's denial of a hearing as its final determination, thereby allowing its jurisdiction to be invoked — as in fact it did, *Garwood I*, 939 N.E.2d at 1155-56 — the Garwoods had prompt access to the post-deprivation remedy to which they were entitled: review of DOR-assessed

liabilities through the protest and refund actions, together with injunction against collection pending appeal. *Clifft*, 660 N.E.2d at 317-18 (such remedies together satisfy due process, notwithstanding DOR may sell seized assets even while appeal pending); *see also Consol. Edison Co. of N.Y. v. NLRB*, 305 U.S. 197, 234 (1938) ("[D]ue process does not require an opportunity to be heard before judgment, if defenses may be presented upon appeal. . . . [T]his rule assumes that appellate review does afford opportunity to present all available defenses . . . ." (citations omitted)). Even if this were not so, it was never Swain's decision to deny the Garwoods an administrative hearing; he therefore could not have been found personally liable for any denial of due process that may have resulted.

[53] The Garwoods' third theory, that the jeopardy assessments "literally never happened" as a matter of historical fact because the assessments were declared legally void by the tax court, Tr. p. 625, and that thereby, DOR was never entitled to rely on the post-deprivation process supplied by review of the jeopardy assessment statute, fails by committing a fundamental error: confusing a violation of state law with a due process violation. *Charleston v. Bd. of Trustees*, 741 F.3d 769, 773 (7th Cir. 2013) ("[W]e will be clear once more: a plaintiff does not have a federal constitutional right to state-mandated process."); *Ind. Land Co.*, 378 F.3d at 711 ("[A]n error of state law is not a violation of due process.").

[54] In *Garwood II*, a state court held that certain facts did not rise to the level required by a state statute authorizing certain state conduct. That does not and

cannot state a due process violation. To accept the Garwoods' contrary contention would in effect allow state courts to create due process violations retroactively by the act of interpreting state law. Given the Garwoods' highly metaphysical conception of voidness in particular, the federal constitutional result would presumably depend on the state court's word choice[9]: state action declared "invalid" or "in excess of statutory authority," for example, would not create due process violations, but declarations of "voidness" would. These contentions cannot be accepted.

The uncontradicted evidence failed to show a procedural due process violation for which Swain could be held personally liable.

### B. Substantive Due Process

In addition to its guarantee of fair procedure, the due process clause encompasses "a substantive component that bars certain arbitrary, wrongful government actions regardless of the fairness of the procedures used to implement them." *Zinermon*, 494 U.S. at 126 (quotation and citation omitted).[10] As elsewhere, the task before us is made more difficult by the Garwoods' refusal to state exactly what conduct by which State defendants they allege

---

[9] We do not deny that distinguishing what is void from what is not "is no mere semantic quibble." *Stidham v. Whelchel*, 698 N.E.2d 1152, 1154 (Ind. 1998). However, that is only so when the distinction between voidness and other kinds of invalidity or error becomes legally operative, which it does not here. *See infra* Part IV.C (discussing failure of trial court to instruct jury on voidness).

[10] The state of this doctrine is notoriously confused and unsettled. *See* Daniel O. Conkle, *Three Theories of Substantive Due Process*, 85 N.C.L. Rev. 63, 63-65 (2006).

offended the standards of substantive due process. Nevertheless, the Garwoods'
substantive due process claim fails because Swain's conduct was rationally
related to a legitimate government interest and did not shock the conscience.

[57] In the most general terms, substantive due process protects against "all
substantial arbitrary impositions and purposeless restraints" enforced by the
state, *Poe v. Ullman*, 367 U.S. 497, 543 (1961) (Harlan, J., dissenting), *quoted in*
*Moore v. City of East Cleveland*, 431 U.S. 494, 502 (1977) (plur.), is "intended to
secure the individual from arbitrary exercise of the powers of government,"
*Albright v. Oliver*, 510 U.S. 266, 272 (1994) (plur.) (internal quotation and
citation omitted), and "serves to prevent governmental power from being used
for the purposes of oppression." *Daniels v. Williams*, 474 U.S. 327, 331 (1986)
(internal citation and quotation omitted). Beyond these broad phrases,
however, "guideposts for responsible decisionmaking in this unchartered area
are scarce and open-ended," and the doctrine must be applied with "utmost
care." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). The United
States Supreme Court has consistently instructed courts to demand the highest
levels of culpability in this context; to demand less "would make of the
Fourteenth Amendment a font of tort law to be superimposed upon whatever
systems may already be administered by the States." *Paul v. Davis*, 424 U.S. 693,
701 (1976).

[58] The most familiar aspect of the doctrine is the protection afforded to
"fundamental" liberty interests in the domains of bodily integrity, personal
autonomy, and intimate relationships. *See Washington v. Glucksberg*, 521 U.S.

702, 723-24 (1997).[11] The scope of protection afforded by substantive due process to property interests, and how if at all such protection is to be distinguished from that afforded to liberty interests, is an unsettled question. Some federal courts of appeals, including our Seventh Circuit,[12] require a substantive due process plaintiff alleging only a property deprivation to "show either the inadequacy of state law remedies or an independent constitutional violation" at the threshold. *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003); *Kauth v. Hartford Ins. Co. of Ill.*, 852 F.3d 951, 956-58 (7th Cir. 1988) (contrary rule would permit due process recovery for random and unauthorized property deprivations in violation of *Parratt*).[13]

[59] It is clear that "substantive due process is not a blanket protection against unjustifiable interferences with property." *Lee*, 330 F.3d at 467. For example, "[n]o one thinks substantive due process should be interpreted so broadly as to protect landowners against erroneous zoning decisions." *Coniston Corp. v. Village*

---

[11] As an aside, we note that *Nebbia v. New York*, 291 U.S. 502 (1934), and *West Coast Hotel Company v. Parrish*, 300 U.S. 379 (1937), signaled the end of invalidation of economic regulations as deprivations of liberty of contract under the substantive due process doctrine of *Lochner v. New York*, 198 U.S. 45 (1905).

[12] As well as the Fourth, *Love v. Pepersack*, 47 F.3d 120, 123 (4th Cir. 1995) ("[The substantive component of the due process clause] is violated only where the state courts can do nothing to rectify the injury that the state has already arbitrarily inflicted."), Sixth, *United of Omaha Life Ins. Co. v. Solomon*, 960 F.2d 31, 35 (6th Cir. 1992) ("The loss which [plaintiff] asserts is not fundamental. Moreover, it is a loss which can easily be remedied in the [state] courts. Hence, we do not believe that the substantive due process clause applies in this instance."), and Eighth Circuits. *Ali v. Ramsdell*, 423 F.3d 810, 814 (8th Cir. 2005) (adopting Justice O'Connor's concurrence in *Hudson v. Palmer*, 468 U.S. 517, 539 (1984) ("[T]he claimant must either avail himself of the remedies guaranteed by state law or prove that the available remedies are inadequate.")).

[13] The Seventh Circuit's rule would defeat the Garwoods' substantive due process claim without more. However, so far as we can tell, the wisdom of adopting it has not yet been considered by a court of this state, and the parties to this case do not mention it. We need not, and therefore do not, decide its status to dispose of this appeal.

*of Hoffman Estates*, 844 F.3d 461, 466 (7th Cir. 1988). Similarly, without more, it ought not be interpreted as to protect against erroneous tax assessments. Substantive due process does not require error-free public administration, nor that enforcement actions be preceded by thorough investigation or narrowly tailored to achieve compelling government interests; it requires only that the challenged conduct "be rationally related to a legitimate government interest, or alternatively phrased, that the [conduct] be neither arbitrary nor irrational." *Lee*, 330 F.3d at 467.

[60] In cases challenging executive action, "only the most egregious official conduct can be said to be arbitrary in the constitutional sense." *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) (quotation omitted). Executive conduct is constitutionally egregious and arbitrary when it "shocks the conscience." *Rochin v. California*, 342 U.S. 165, 172 (1952). In a substantive due process challenge to executive action, "the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Lewis*, 523 U.S. at 847 n.8. In emergency situations, the proper standard for conscience-shocking behavior is intent to harm. *Lewis*, 523 U.S. at 854. In situations where actual deliberation is practical, "deliberate indifference" may rise to the level of culpability that implicates the due process clause. *Id.* at 848-49 (citation omitted).

[61] At the minimum, then, the Garwoods were required to show that Swain's and the other State defendants' conduct was not rationally related to a legitimate government interest, and that the totality of the circumstances shocked the

conscience. The Garwoods did neither. *Conroe Creosoting Co. v. Montgomery County*, 249 F.3d 337 (5th Cir. 2001) (dismissing appeal from denial of qualified immunity for lack of jurisdiction) is a useful point of comparison. There, a county school district obtained a roughly $75,000 tax judgment and a writ of execution against a corporation resident in the county, whose total assets were found in the tax judgment to be worth roughly $800,000. *Id.* at 338. The county tax assessor ordered the seizure and "complete dispersal" at auction of all the corporation's assets. *Id.* at 339. As a result, the corporation was permanently shuttered. *Id.*

[62] Taken as true, the corporation's allegations established that the assessor knew the writ of execution could not be enforced by a county tax assessor under state law; the assessor ignored the corporation's state procedural right to designate certain essential assets as exempt from sale, and sold them anyway; the assessor sought a tax warrant affirming that the corporation's assets were in danger of removal from the county *after* revenue officials had already taken total custody of them; and the assessor selected his friends as the auctioneers. *Id.* at 341–42. A Fifth Circuit panel held this mix of knowing illegality, falsification, and self-dealing sufficiently arbitrary and conscience-shocking to warrant factual determination of the qualified immunity issue. *Id.* at 342.

[63] Whether conduct is conscience-shocking "may be informed by a history of liberty protection," and "necessarily reflects an understanding of traditional executive behavior, of contemporary practice, and of the standards of blame generally applied to them." *Lewis*, 523 U.S. at 847 n.8; *Rochin*, 342 U.S. at 171-

72 (distinguishing what shocks the conscience based on "considerations deeply rooted in reason and in the compelling traditions of the legal profession," from what "offend[s] some fastidious squeamishness" and "private sentimentalism"). The historical and traditional relation of taxation and due process points the way to distinguishing *Conroe Creosoting* from this case.

> Given a purpose or object for which taxation may be lawfully used and the extent of its exercise is in its very nature unlimited. . . . The power to tax is, therefore, the strongest, the most pervading of all the powers of government . . . . [But even this power must be substantively limited.] To lay with one hand the power of the government on the property of the citizen, and with the other to bestow it upon favored individuals to aid private enterprises . . . is not legislation. . . . Nor is it taxation. . . . We have established . . . beyond cavil that there can be no lawful tax which is not laid for *a public purpose*.

*Citizens' Sav. & Loan Ass'n v. City of Topeka*, 87 U.S. 655, 663-64 (1874) (original emphasis). Tax laid for a nonpublic purpose is not due process of law because it is not *law*. But given public purpose,

> there has been no period, since the establishment of the English monarchy, when there has not been, by the law of the land,[14] a summary method for the recovery of debts due to the crown . . . . [T]he methods of ascertaining the existence and amount of [public revenues owed to the state by customs agents], and compelling their payment, have varied widely form the usual course of the common law on other subjects . . . . The power to

---

[14] This phrase is recognized to be the equivalent of "due process of law." *Murray's Lessee*, 59 U.S. at 276; *see also Glucksberg*, 521 U.S. at 757 n.5 (Souter, J., concurring in the judgment).

collect and disburse revenue, and to make all laws which shall be necessary and proper for carrying that power into effect, includes all known and appropriate means of effectually collecting and disbursing that revenue, unless some such means should be forbidden in some other part of the constitution.

*Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 277, 281 (1855) (approving "distress warrants" for collection of customs revenue from customs agents). Finally, then,

whenever by the laws of a State, or by State authority, a tax, assessment, . . . or other burden is imposed upon property for public use, whether it be for the whole State or of some more limited portion . . . , and those laws provide for a mode of confirming or contesting the charge thus imposed, . . . with such notice to the person, or such proceeding in regard to the property as is appropriate to the nature of case, the judgment in such proceedings cannot be said to deprive the owner of his property without due process of law, *however obnoxious it may be to other objections*.

*Davidson v. City of New Orleans*, 96 U.S. 97, 104–05 (1877) (emphasis added).

[64] Historically and traditionally, taxation has been recognized as unique among the powers of the state, substantively limited by the due process clause only by the requirement of a public purpose and by independent constitutional prohibitions. In this context, where the state's power nears its maximum, a complaining party that alleges the "most egregious" conduct must present an exceptionally strong case. *Lewis*, 523 U.S. at 846.

In *Conroe Creosoting*, public purpose was vitiated by the assessor's levy on assets known to be valued far in excess of the debt, and by self-dealing in the selection of auctioneers. Here, by contrast, the assets levied on were thought to be worth far less than the debt, the latter figure estimated by DOR's regular procedures, the former negotiated by Swain with an independent nonprofit organization; and there was no suggestion of self-dealing. In *Conroe Creosoting*, the court noted that the claim might have been brought under the Fourth Amendment or the takings clause of the Fifth Amendment. 249 F.3d at 340 n.9. Here, by contrast, no independent constitutional limit was asserted.[15] Finally, in *Conroe Creosoting*, the mix of knowing illegality, falsification, and self-dealing showed, or permitted a reasonable inference of, bad faith, malice, or intent to harm. Here, by contrast, there was no evidence of these and no reasonable inference of them.

Two sets of public purposes for the issuance of jeopardy tax assessments and warrants against the Garwoods were put forward, and the assessments and warrants bore enough of a rational relation to these legitimate governmental interests to withstand the most deferential standard of judicial review. *See Brown v. City of Michigan City*, 462 F.3d 720, 733 (7th Cir. 2006) ("To find that a government action violates the requirements of substantive due process in this

---

[15] In their second amended complaint, the Garwoods did assert a Fourth Amendment claim. Appellant's App. Vol. II, p. 112. It is unclear what became of it, as it was still live when the State moved for summary judgment and survived that motion. In any event, it was not tried. Given that the entry onto and seizure of the Garwoods' property was done under a duly issued search warrant of Marion Superior Court, such a claim would have failed on its face.

context, it must be utterly lacking in rational justification." (quotation and citation omitted)). The first set related to the uses of the tax laws generally, and the jeopardy procedure in particular, to combat unregistered, non-reporting businesses like the Garwoods':

> [I]n general the rationale is that . . . you want to send a deterrent message because if you have businesses that are operating off the grid and not recording their taxes then . . . you want to shut down a few in order to send a deterrent message to try to get those that are also operating and probably not remitting their taxes . . . [to] see there's actually teeth to the tax laws and that somebody is actually paying attention . . . . The other rationale is that when these businesses are operating improperly and they are not remitting their taxes, then they're essentially a drain on society [be]cause they're essentially using those tax monies to run their businesses. Essentially they're having the state subsidize their businesses. . . . [Y]ou might as well get rid of that business and try to get a better business in there . . . [which] also removes any competitive disadvantage that legitimate businesses have . . . . [A] business who doesn't remit their sales taxes can sell their product at a cheaper price th[a]n a legitimate business that does collect sales tax and remits it to the State.

Tr. pp. 199-200 (Swain's testimony); *see also* Ex. Vol. I, Pls.'s Ex. 2 (Swain's article detailing use of tax laws to combat underground businesses). Thus, even if the jury found that the raid was undertaken as a kind of *in terrorem*, shock-and-awe campaign for the purpose of shutting down the Garwoods' unregistered dog-breeding business, that conduct, while arguably harsh and overzealous, was rationally related to a legitimate government interest.

[67] The second set of public purposes was asserted by the Garwoods themselves as a basis for their substantive due process claim. The Garwoods asserted repeatedly that the jeopardy assessments were not *really* done for the fiscal purpose of collecting tax; they were *really* done for the non-fiscal purpose of combatting the socially undesirable activity of "puppy mills." The Garwoods may have asserted this as an attack on the State's deprivation of their property as arbitrary and irrational, or as a liberty interest in being free from taxation for non-fiscal purposes. In either event, the argument fails. It is neither arbitrary nor irrational to use the tax laws for social, non-fiscal purposes, and the Garwoods did not have a fundamental right "deeply rooted in this [n]ation's history and traditions," *Glucksberg*, 521 U.S. at 721, to be free from taxation for such purposes.

[68] It is uncontestable that ensuring the welfare of animals and the welfare of consumers are legitimate government interests. This is reflected by Indiana's laws on animal cruelty, consumer protection, and the like, in particular by Indiana's new commercial dog-breeding, anti-puppy-mill statute, in effect since 2010. *See* I.C. art. 15-21 ("Commercial Dog Breeder Regulation"). Accordingly, it is neither arbitrary nor irrational to use the tax laws to discourage or prevent businesses from harming animals and harming consumers.

[69] Furthermore, the use of tax as a means to nontax ends is allowed today and is nearly as old as taxation itself. *See, e.g., Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) (upholding fine exacted to incentivize purchase of health insurance under the Affordable Care Act as an exercise of Congress's taxing

power); *Idris v. City of Chicago*, 552 F.3d 564, 566 (7th Cir. 2009) ("Taxes, whether on liquor or on running red lights, are valid municipal endeavors. . . . [They do] more than raise revenue: [they] also discourag[e] the taxed activity. A system that simultaneously raises money and improves compliance with the traffic laws . . . cannot be called unconstitutionally whimsical."); Joseph T. Sneed, *Taxation*, 11 J. Pub. L. 3, 11 (1962) ("[T]he design is to make the desire to avoid taxes overcome any disinclination to follow the wishes of the government. Thus, Cato, in imposing a heavy sumptuary tax on certain luxury items in 184 B.C., and Kennedy, in proposing a tax credit for plant and equipment investments in 1961 A.D., employed the same principle."). If the Garwoods meant to assert a deeply rooted liberty interest in being free from such practices, that assertion fails.

[70] Finally, whatever degree of fault may be attributed to the State's total course of proceeding against the Garwoods, Swain's personal share of that fault simply did not rise to a conscience-shocking level.

[71] The Garwoods pointed repeatedly to Swain's celebratory toast with Zoeller on the evening of June 2, 2009; the award received by Swain from the Humane Society; and Swain's published article on the use of tax laws to combat underground businesses. We acknowledge it may have been difficult for the Garwoods to bear the sight of state officials congratulating one another over the ruin of the Garwoods' dog-breeding business and earning public praise into the bargain. Nevertheless, the Garwoods cannot seriously allege that the substantive due process violation was only complete with the clink of the

glasses in Louisville, still less with the later Humane Society ceremony in Washington, D.C.

[72]    Taken only as evidence of the actors' state of mind, these facts give rise to no reasonable inference of malice, bad faith, or intent to harm. State agents often celebrate the success of their enforcement actions, and those enforcement actions always come at the expense of their targets. This fact does not state a due process violation. Similarly, state agents are sometimes honored or rewarded for the success of their enforcement actions. Without more — and here there was no more — that does not give rise to a reasonable inference that the action was done only for the sake of such honor or reward. Similarly, Swain's article, to the extent it was relevant at all, must point away from liability rather than toward it. No reasonable juror could have concluded that the article was written and published as an instruction manual for oppressing dog breeders by the arbitrary exercise of state power; if it was more than academic commentary, the article was an instruction manual for rationally using legally available means to achieve legitimate government ends.

[73]    Though Swain was presented by the State merely as a lawyer offering advice, the jury could have reasonably laid at his feet the choice of the jeopardy procedure as a tactical and strategic matter, the OMB's final decision to pursue the Garwoods in this fashion notwithstanding. Swain admittedly negotiated the sale of the dogs to the Humane Society for the negligible sum of $300. However, as set out above, the choice of the jeopardy procedure served legitimate ends, and no evidence showed, or gave reason to infer, that Swain

made the choice for the purposes of oppression, harm, or private gain. The BIA assessments may have overestimated the Garwoods' tax debt, but Swain was not responsible for preparing those figures. As in the context of procedural due process, the mere fact that Swain's good-faith interpretation of the phrase "any other act" in the jeopardy assessment statute, I.C. § 6-8.1-5-3(a), was rejected on review by the tax court in *Garwood II* — the mere fact that a state official pushed the limits of his statutory enforcement authority — does not state a substantive due process violation.

[74]  Swain may have also underestimated the value of the dogs, but $300 is nevertheless $300 more than what the Humane Society thought the dogs were worth. Tr. p. 267. In any event, "if the Garwoods came in, were able to establish what they believe was a legitimate value of the dogs, then it has always been [DOR]'s practice to credit that against the taxes [owed]." *Id.* at 276 (Swain's testimony). Thus, if any party was injured by the undervaluation of the dogs, it was not the Garwoods, but DOR, which stood to lose the difference between $300 and whatever value the Garwoods might be able to prove in later proceedings. We note again that this situation is precisely the opposite of that in *Conroe Creosoting*, where the assets levied on and sold were known to be valued far in excess of the tax debt embodied in the tax judgment.

[75]  No reasonable jury could have concluded that Swain was actuated by malice, bad faith, or intent to harm. However, to find such a high level of culpability was not demanded of the jury in this case. The jury was instructed as follows:

> Substantive due process protects an individual against the arbitrary action of government and the exercise of governmental power without reasonable justification. In deciding whether Defendants deprived Plaintiff of this right, you must determine whether . . . Defendants' actions can be properly characterized as shocking the conscience. Conduct that shocks the conscience is reckless, deliberately indifferent, or so brutal and offensive that it does not comport with traditional ideas of fair play and decency.[16] . . . When I use the term deliberately indifferent I mean that Defendants actually knew of a substantial risk of serious harm to the Plaintiffs, and that the Defendants consciously disregarded that risk by failing to take reasonable measures to deal with it.[17]

Tr. pp. 905-06.

[76] The jury was not properly instructed. To find a violation of the Garwoods' "right" to substantive due process, the jury was told to find conscience-shocking behavior. To find conscience-shocking behavior, in turn, the jury was told to find conduct that was reckless *or* deliberately indifferent *or* unacceptably brutal and offensive. The Garwoods were never required, either before the judge or the jury, to show the absence of a rational basis for the State's conduct. Recklessness was never defined. The instructions thus permitted the jury to find constitutional liability for deprivation of personal property that it could characterize as "reckless" in the abstract, untethered to any independent

---

[16] This language was taken from *Rochin*, 342 U.S. at 173 ("the community's sense of fair play and decency"), 174 ("so brutal and so offensive").

[17] This language was taken from *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

constitutional right, fundamental liberty interest, or lack of a rational basis for the State's conduct. This is very far from the highest levels of culpability required to show the "most egregious official conduct," *Lewis*, 523 U.S. at 846, and does precisely what the Seventh Circuit's rule in *Lee* seeks to avoid and what is prohibited by the United States Supreme Court: it "make[s] of the Fourteenth Amendment a font of tort law to be superimposed" on the tort law of this state. *Paul v. Davis*, 424 U.S. at 701.

[77]   Similarly, the jury was instructed on deliberate indifference. It is true that *Lewis* held deliberate indifference may rise to a conscience-shocking level when deliberation is practical, 523 U.S. at 848-49, and the State's action in this case was obviously deliberated and deliberate. However, the standard begs the question, indifferent to what? *Lewis* was a case about the constitutionally protected interests in life and bodily integrity, as was *Rochin*. *See Glucksberg*, 521 U.S. at 719-20 (listing liberty interests protected by substantive due process). "Deliberate indifference" originated as a standard for defining Eighth Amendment violations: "[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (quotation and citation omitted); *see also Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (supplying language of jury instruction here in context of "serious harm" of prison battery and rape); *Bell v. Wolfish*, 441 U.S. 520, 545 (1979) (same standard under Fourteenth Amendment for pretrial detainees).

[78] Thus, constitutional liability will lie, in the appropriate context, for deliberate indifference to life and bodily integrity, serious medical need, and substantial risk of serious physical harm. So far as we can tell, "deliberate indifference" has never been applied to mere deprivations of property interests, but this is how it was applied in the instructions here. The Garwoods' property interest in the dogs was not a constitutional right in and of itself; it was a state-created interest protected by their constitutional right to due process of law. The instructions speak of a "substantial risk of serious harm" to the Garwoods, Tr. p. 906, but there was never any suggestion of *physical* harm to the Garwoods. The instruction was not founded on the evidence unless it was understood to include economic harm; but, so understood, the instruction was not founded on the law. Even under this highly permissive standard, there was no evidence that Swain "actually knew of a substantial risk" that his interpretation of the jeopardy assessment statute would work an *ultra vires* deprivation of the Garwoods' property interest.[18] Tr. p. 906.

[79] In sum: the State's conduct was rationally related to one or more legitimate government interests. Examined in its proper historical and traditional context, the State's conduct, while erroneous on one point of state law, did not shock the conscience. Swain's personal conduct also cannot sustain the judgment against

---

[18] Swain testified that, to his knowledge, the tax court had never "thrown out any jeopardy assessment prior to" *Garwood II*. Tr. p. 359. It was argued both at trial, *see* Tr. pp. 286-87, and before the tax court, *see Garwood II*, 953 N.E.2d at 688 n.12, that federal interpretations of the federal jeopardy assessment statute supported Swain's interpretation.

him. The uncontradicted evidence failed to show a substantive due process violation for which Swain could be held personally liable.

### C. Equal Protection

[80] The equal protection clause of the Fourteenth Amendment prohibits this state "to deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1, cl. 4. The state must treat people the same unless it has a good reason to treat them differently; how good the state's reason must be varies according to nature of the class being singled out. *Brunson v. Murray*, 843 F.3d 698, 705 (7th Cir. 2016); *City of Indianapolis v. Armour*, 946 N.E.2d 553, 564 (Ind. 2011). Where the class is not defined by an immutable characteristic and a history of discrimination — that is, has not been judicially declared a "suspect classification" — the state's treatment of the class will be reviewed for rationality only. *Brunson*, 843 F.3d at 706; *Armour*, 946 N.E.2d at 559. Only intentional, invidious discriminatory treatment offends the equal protection clause. *Washington v. Davis*, 426 U.S. 229, 239 (1976).

[81] Equal protection jurisprudence "recognize[s] . . . claims brought by a 'class of one,' where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam). Allegations to this effect state a claim to relief "quite apart from the [state actors'] subjective motivation" or "subjective ill will," the status of which the *Olech* Court declined to reach. *Id.* at 565. Justice Breyer concurred in the result:

It might be thought that a rule that looks only to an intentional difference in treatment and a lack of a rational basis for that different treatment would work . . . a transformation [of many ordinary violations of city or state law into violations of the Constitution]. . . . This case, however, does not directly raise [that] question . . . . because the Court of Appeals found that . . . [the plaintiff] had alleged an extra factor . . . that the Court of Appeals called "vindictive action," "illegitimate animus," or "ill will." . . . [T]he presence of that added factor . . . is sufficient to minimize any [such] concern . . . .

*Id.* at 565-66.

[82] Seventh Circuit authority is split as to whether animus or ill will are required, *Brunson*, 843 F.3d at 706 (position of Posner, J.), merely relevant, *id.* (position of Wood, C.J.), or entirely irrelevant. *Id.* (position of Easterbrook, J.). Our supreme court has said it found "most convincing" Judge Posner's "argument for adopting Justice Breyer's reasoning in *Olech*." *Armour*, 946 N.E.2d at 565. But in *Armour*, our supreme court held, "[T]his is not a class-of-one case." *Id.* at 566. The *Armour* court's statement on the animus question was therefore dictum; nevertheless, the dictum signals that our supreme court would adopt Judge Posner's position if the question were presented to it. We therefore adopt that position here.

[83] Seventh Circuit authority is similarly unsettled as to the need for a class-of-one plaintiff to identify similarly-situated comparators; no published decisions of this state's courts have considered the question since *Olech*. In the Seventh Circuit, comparators may not be required "where the . . . facts so clearly suggest

harassment by public officials that has no conceivable legitimate purpose," because such conduct "demonstrate[s] on its own the [state agents'] improper discriminatory purpose . . . ." *Brunson*, 843 F.3d at 707 (quotations and citations omitted) (discussing *Geinosky v. City of Chicago*, 675 F.3d 743, 748-49 (7th Cir. 2012)). Comparators may also not be required where "disparate treatment is easily demonstrated but similarly situated individuals are difficult to find." *Id.* at 706. Such was the case in *Brunson* itself, where the plaintiff, complaining of the denial of a Class B liquor license by local government officials, operated the only package liquor store and held the only such license in a town of 2,500 people. *Id.* at 707. Requiring comparators there "would not [have] help[ed] distinguish between ordinary wrongful acts and deliberately discriminatory denials of equal protection." *Id.* (quotation and citation omitted).

[84] In their second amended complaint, the Garwoods alleged they were "targeted . . . because they were breeders of companion animals," Appellant's App. Vol. II, p. 113, suggesting an equal protection claim for discrimination by DOR against the class of "breeders of companion animals." However, there was never any evidence presented as to how this purported class was treated differently by DOR as against breeders of working animals, other agricultural or husbandry enterprises, or other businesses or persons of any description whatever.

[85] The equal protection claim actually put to the jury sounds as a class-of-one (more precisely, a class-of-two) claim. *See* Tr. p. 906 (equal protection jury instruction) ("Defendants . . . intentionally treated Plaintiffs [without qualification] differently from other[s] similarly situated . . . ."). That claim

fails. As discussed above under substantive due process, DOR's treatment of the Garwoods survives rational-basis review in isolation. Thus, unlike the *Geinosky* plaintiff, the Garwoods cannot bootstrap a campaign of irrational, arbitrary treatment into its own "demonstrat[ion of] . . . improper discriminatory purpose . . . ." *Brunson*, 843 F.3d at 707. Further, unlike the *Brunson* plaintiff, the Garwoods' claim did not operate in a restricted universe of potential comparators. Whereas Brunson was the only person subject to the town's Class B liquor license renewal authority, every person and business in Indiana is subject to DOR's revenue collection authority.

[86] Identification of similarly situated comparators was therefore necessary to "distinguish between ordinary wrongful acts and deliberately discriminatory denials of equal protection." *Id.* However, no favorable comparators were identified by the Garwoods. We cannot review whether "there [wa]s no rational basis for the difference in treatment," *Olech*, 528 U.S. at 564, because no difference in treatment was shown.

[87] In fact, Swain's testimony identified one similarly situated person, Tammy Gilcrest, but she was treated in precisely the same way. Like the Garwoods, "the Gilcrests were not registered to conduct sales in Indiana and they were performing numerous sales of dogs and not collecting sales tax and not remitting any tax to the State of Indiana." Tr. p. 187. Like the Garwoods, Gilcrest was subjected to "a criminal search warrant and a jeopardy assessment" by DOR. *Id.* at 186. Like the Garwoods', Gilcrest's inventory of dogs was seized and sold. *Id.* at 201. A breeder named Darlene Clark was

apparently subjected to similar treatment, *id.* at 202, though the facts of her case were not stated. Swain recounted other businesses enjoined, like the Garwoods,[19] from doing further business until their tax liabilities were satisfied; some were shuttered as a result. *Id.* at 256 ("Popeye's Chicken went out of business. The funeral home that we did up north went out of business. Tire Barn in Kokomo went out of business . . . ."). No evidence showed any difference in treatment between the Garwoods and others similarly situated.

[88] Finally, as discussed above under substantive due process, the record does not disclose subjective animus, ill will, or vindictiveness on the part of State officials, and on Swain's part in particular, towards the Garwoods. To the extent our supreme court would require such evidence to support a successful class-of-one claim, *see Armour*, 946 N.E.2d at 565, the Garwoods failed to carry their burden on this point.

[89] The uncontradicted evidence failed to show an equal protection violation for which Swain could be held personally liable.

### III. Because the Garwoods Are Not a Prevailing Party, Their Lawyers Are Not Entitled to Fees Under § 1988

[90] Under the fee-shifting provision of the federal civil rights statutes, a court hearing a § 1983 suit, "in its discretion, may allow the prevailing party" to

---

[19] Such injunctions are authorized "[a]t any time after a judgment arising from a tax warrant has been recorded," I.C. § 6-8.1-8-5, not only in the context of jeopardy tax warrants.

recover a "reasonable attorney's fee . . . ." 42 U.S.C. § 1988(b). For their limited success against Swain, the trial court awarded the Garwoods an $80,000 fee plus $9,500 costs. Appellant's App. Vol. II, p. 87. The Garwoods seek to increase this award substantially on appeal.

[91] To be a prevailing party within the meaning of § 1988, "a plaintiff [must] receive at least some relief on the merits of [her] claim . . . ." *Hewitt v. Helms*, 482 U.S. 755, 760 (1987). A result counts as "relief . . . if, and only if, it affects the behavior of the defendant toward the plaintiff." *Rhodes v. Stewart*, 488 U.S. 1, 4 (1988). A favorable trial court judgment reversed on appeal is not relief. The Garwoods are therefore not a prevailing party and not entitled to a fee award under § 1988. Accordingly, we vacate the trial court's order for fees and costs.

### IV. The Trial Court Committed No Prejudicial Error in Its Rulings on Admissibility, Preclusion, and Jury Instructions

[92] For their appeal, the Garwoods claim the trial court abused its discretion by failing to collaterally estop the State to litigate issues decided by the tax court in *Garwood II*, or alternatively by failing to admit the tax court's *Garwood II* decision in its entirety; by failing to exclude the jeopardy assessments or to give an instruction as to their voidness; and by failing to exclude records of the criminal proceedings against them.

[93] We review the trial court's evidentiary rulings for abuse of its broad discretion, reversing only if the ruling is clearly against the logic and effect of the facts, and

the error is not harmless but affects substantial rights. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). We apply the same standard to the trial court's preclusion ruling, *Tofany v. NBS Imaging Sys., Inc.*, 616 N.E.2d 1034, 1039 (Ind. 1993), and to its ruling on jury instructions that correctly state the law. *Dawson v. Thornton's, Inc.*, 19 N.E.3d 337, 339 (Ind. Ct. App. 2014), *trans. denied*.

### A. Admission of Criminal Matter

[94] The Garwoods claim that the trial court ran afoul of Indiana Evidence Rules 609 and 403 by admitting the State's information charging the Garwoods with criminal tax offenses, Ex. Vol. I, Pls.'s Ex. 31, p. 172, Ex. Vol. II, Defs.'s Ex. I, p. 367, and the transcript of the Garwoods' change of plea hearing. Ex. Vol. II, Defs.'s Ex. J, p. 372. We find no error.

### 1. Charging Information

[95] Rule 609 regulates admission of convictions to impeach a witness for untruthful character. Evid. R. 609(a) ("For the purposes of attacking the credibility of a witness, evidence that the witness has been convicted of a crime . . . must be admitted" if the crime is one of several listed.). Extrinsic evidence of any other specific instances of conduct is inadmissible for this purpose. Evid. R. 608(b). However, the Garwoods' charging information was not offered to impeach any witness. As the State's trial counsel explained after offering the information on cross-examination of Michael Smith, an investigator for the attorney general's office and a friendly witness to the State, "We are offering [the information] for the purpose of showing the chronology of events of this case," Tr. p. 670, that

is, to show the State's swift but procedurally regular conduct as to the Garwoods, presumably probative of the State's good faith in pursuing the Garwoods' tax debts. Rule 609 therefore does not control the admissibility of the information in this context.

[96] Rule 403 allows exclusion of relevant evidence if its probative value is substantially outweighed by the risk of several enumerated dangers, including unfair prejudice, jury confusion, and needless presentation of cumulative evidence. Evid. R. 403. While the information may have been only weakly probative and cumulative of other evidence for the purpose of proving the Garwoods' criminal convictions, it was neither for the purpose of showing the State's total course of proceeding with respect to the Garwoods, as noted above. Moreover, in a case where what process was given and what process was due were major questions, we cannot see how the jury could be *unfairly* prejudiced by a record of that process. No doubt the evidence was prejudicial to the Garwoods' self-portrayal as law-abiding businesspeople unfairly singled out, but that is not the relevant question. The trial court did not abuse its discretion by concluding that, relative to its probative value, the information would cause the jury neither to "substantially overestimate" its value nor to be excessively "arouse[d]" or "inflame[d]" against the Garwoods. *Duvall v. State*, 978 N.E.2d

417, 428 (Ind. Ct. App. 2012) (articulating standard for reversible unfair prejudice).[20]

### 2. Change of Plea Hearing Transcript

[97] For similar reasons, no error arose from the trial court's admission of the transcript from the Garwoods' change of plea hearing.[21] The Garwoods insist that the transcript was not "evidence that [a] witness has been convicted of a crime," Evid. R. 609(a), Appellant's Br. at 32, but this is flatly contradicted by the Garwoods' admissions of criminal guilt and the trial court's acceptance of those admissions contained in the transcript. Indeed, the transcript is better evidence of the Garwoods' criminal convictions than their plea agreements, to which the Garwoods do not object, because the agreements do not disclose that they were accepted by the court and actually resulted in convictions. *See* Ex. Vol. II, Defs.'s Exs. G (Kristen), H (Virginia). Thus Rule 609 permitted

---

[20] We note that, after the State offered the initial information filed on June 22, 2009, Ex. Vol. II, Defs.'s Ex. I, p. 367, the Garwoods then offered the amended information filed on May 11, 2010, Ex. Vol. I, Pls.'s Ex. 31, p. 172, "for the purposes of completeness . . . ." Tr. p. 756. The two documents were identical but for handwritten marks revising certain dates and crossing out later-dropped charges. The amended information offered by the Garwoods is no more or less unfairly prejudicial or needlessly cumulative than the initial information offered by the State. If admission of the information was error, it was at least partly invited by the Garwoods. Invited error is not reversible error. *Wright v. State*, 828 N.E.2d 904, 907 (Ind. 2005). Finally, we note that in seeking admission of the amended information, the Garwoods appeared to waive their challenge to the admission of the initial information. Tr. pp. 696-97 ("[W]e have no issue with [the initial information] so long as we can admit . . . the amended [information] . . . . I won't need to renew our [objection] and we can move forward . . . .").

[21] The Garwoods refer to this proceeding as a "sentencing hearing," *see, e.g.,* Appellant's Br. at 31, but, except for the details of the plea agreements, already visible to the jury from the agreements themselves, almost all testimony relating to the Garwoods' sentences was redacted from the transcript. The only testimony retained related to uncontested facts otherwise shown at trial: that OAG bought two dogs from the Garwoods as part of its investigation, Ex. Vol. II, Defs.'s Ex. J, p. 386, and that DOR and OAG found dogs at the Garwoods' during the raid on June 2, 2009. *Id.* p. 387.

(indeed, required) admission of the transcript for impeachment purposes. *See* Appellee's Br. at 37-38 (describing impeachment value of Garwoods' admissions of *knowingly* having committed tax crimes in context of Garwoods' trial testimony pleading ignorance).

[98] However, the transcript was not offered only for impeachment; it was offered and admitted for its truth. "We [the State] are offering this [transcript] as substantive evidence of what the Garwoods did." Tr. p. 693. We cannot say that its probative value, either as impeachment or as substantive evidence, was substantially outweighed by the risk of unfair prejudice to the Garwoods under Rule 403. As with all guilty pleas, the judge at the Garwoods' plea hearing was required to find a factual basis for their pleas. In a case challenging the State's tax enforcement as unfair and in bad faith, the jury cannot have been *unfairly* prejudiced against the Garwoods by hearing Virginia admit in open court that she "with the intent to defraud the State . . . or evade income tax . . . omitt[ed] or falsif[ied] profits . . . from the sale . . . of dogs . . . ," Ex. Vol. II, Defs.'s Ex. J, p. 384, or by hearing both Virginia and Kristen admit in open court that they "knowingly failed" to remit sales tax to the State. *Id.* p. 383.

## B. Failure to Apply Collateral Estoppel or to Admit Garwood II in Its Entirety

[99] The Garwoods complain that Swain and other State defendants were heard to testify that the Garwoods were operating an unregistered dog-breeding business that failed to report its income and failed to collect and remit sales tax, and that jeopardy assessments were sought on this basis. These facts were

uncontradicted, admitted by the Garwoods in the agreed order in Harrison Circuit Court, and proved at trial. The Garwoods nevertheless believe that the tax court's decision in *Garwood II* conclusively settled these issues to the contrary, and should have barred any other testimony under the doctrine of offensive collateral estoppel. In the alternative, the Garwoods argue, the tax court's opinion should have been admitted in its entirety.

[100] Collateral estoppel precludes relitigation of a fact or issue necessarily decided in earlier litigation. *Bartle v. Health Quest Realty VII*, 768 N.E.2d 912, 917 (Ind. Ct. App. 2002), *trans. denied*. Collateral estoppel is defensive when asserted by a previously successful defendant against a previously unsuccessful plaintiff; it is offensive in the opposite configuration. *Id.*

[101] One issue was necessarily decided in *Garwood II*: whether, "on . . . statutory/regulatory construction grounds," 953 N.E.2d at 684, certain uncontested facts rose to the level demanded by the jeopardy assessment statute for a finding of exigency. That statute supplies four bases for a finding of exigency; two were not asserted by DOR before the tax court. *Id.* at 687 (intent to quickly leave state or remove property from state). DOR argued that the Garwoods had "intend[ed] to . . . conceal [their] property in the state," I.C. § 6-8.1-5-3(a), and "intend[ed] to . . . do any other act that would jeopardize the collection of . . . taxes [owed] . . . ." *Id.*

[102] As to the first asserted basis, the tax court held, "Virginia's refusal to allow the Harrison County Animal Control Officer on her property in response to a

consumer complaint is not evidence of her attempt to conceal property in the state within the meaning of" the jeopardy assessment statute. 953 N.E.2d at 688. The tax court also rejected DOR's speculation that the Garwoods could have set the dogs free in order to conceal them. *Id.* As to the second asserted basis, the tax court held,

> [T]he advertisement of dogs for sale in local newspapers, the breeding and sale of dogs, the failure to register as a retail merchant, the failure to prepare and file sales tax returns, and the failure to report income earned from the retail sales of animals on their individual income tax returns . . . [do not] alone constitute a litmus test for properly issuing a jeopardy assessment. . . . [T]aken as a whole, these actions suggest that the Garwoods were not properly reporting and paying taxes allegedly due, not that they intended not to pay, or preserve the wherewithal to pay, their taxes. . . . [Moreover,] Virginia's tax preparer included income from the sale of dogs in her 2008 tax return. . . .

*Id.* at 689. The tax court concluded,

> The Court holds that [DOR] did not show the presence of the statutorily prescribed exigent circumstances that the Garwoods[] intended to quickly leave the state, remove their property from the state, conceal their property in the state, or do any other act that would jeopardize the collection of taxes.

*Id.*

[103] Below, DOR never disputed a single fact underlying the tax court's decision, nor the holding itself. DOR never argued that the jeopardy assessments were valid; it argued, correctly, that the assessments' invalidity does not give rise to a

due process violation, an equal protection violation, conversion, or IIED. The State's evidence did suggest that Swain's and others' interpretation of the jeopardy assessment statute was done in good faith, but the tax court never found otherwise, and, because such a finding would not have been necessary to resolve the statutory construction question before the court, such a finding could have not furnished a basis for estoppel. The tax court's dicta about "media hype," "a media circus roil[ing]," and DOR's "wield[ing] the power of jeopardy assessments as a sword," *id.* at 690, stand on the same footing.

[104] Given the uncontested nature of the tax court's holding and of the handful of facts on which that holding rested, the trial court did not abuse its discretion in declining to give *Garwood II* preclusive effect. Put differently, the Garwoods already enjoyed the benefit of the only estoppel to which they were entitled.

[105] For the same reasons, the trial court did not abuse its discretion by excluding all of the *Garwood II* opinion but its square holding. Indeed, the court would have abused its discretion by *admitting* the entire opinion. The *Garwood II* dicta regarding the circumstances of the raid and its perceived nontax purpose were probative only of the tax court's subjective disapproval of the State's course of proceeding. That subjective disapproval was immaterial to the Garwoods' case in Harrison Circuit Court. Moreover, the dicta mirrored the arguments the Garwoods put repeatedly to the jury. Their minimal or nonexistent probative value was substantially outweighed by the risk of unfair prejudice and jury confusion that would have resulted had the jury perceived the Garwoods' arguments to have already received the judicial imprimatur of the tax court,

when such imprimatur was legally meaningless. There was no abuse of discretion in the trial court's exclusion of most of the *Garwood II* opinion.

### C. Failure to Give Jury Instruction on Voidness and Admission of Jeopardy Assessments

[106]   The Garwoods unsuccessfully sought an instruction that "[a] void judgment is one that, from its inception, is a complete nullity and without legal effect." Appellant's App. Vol. II, p. 88. Because this instruction correctly states the law, we will reverse the trial court's failure to give it if it was supported by evidence, did not repeat material adequately covered by other instructions, and the failure prejudiced the tendering party's substantial rights. *Morris v. K-Mart, Inc.*, 621 N.E.2d 1147, 1148 (Ind. Ct. App. 1993), *trans. denied*.

[107]   The instruction was not supported by evidence, and failure to give it did not prejudice the Garwoods. It was not supported by evidence because no judgment was at issue in this case. The jeopardy assessments were declared by the tax court to be "void as a matter of law," *Garwood II*, 953 N.E.2d at 690, but DOR's jeopardy assessments are not judgments. *See* Restatement (Second) of Judgments § 1 (Am. Law Inst. 1982) ("A court has authority to render judgment when . . . ."); 49 C.J.S. *Judgments* § 1 (2009) ("A judgment may be broadly defined as the decision or sentence of the law given by a court or other tribunal . . . ."); 46 Am. Jur. 2d *Judgments* § 1 (2006) ("A judgment is a judicial action of the court.").

[108] However, the instruction was inapplicable in a more fundamental sense, and giving it risked leading the jury into the same confusion under which the Garwoods labor, contrary to the purpose of instructing the jury. *See Dawson v. Thornton's, Inc.*, 19 N.E.3d 337, 339 (Ind. Ct. App. 2014) ("The purpose of jury instructions is to inform the jury of the law applicable to the facts without misleading [it] . . . ."), *trans. denied*. The jeopardy assessments were declared "void as a matter of *law*." *Garwood II*, 953 N.E.2d at 690 (emphasis added). "A void judgment is . . . without *legal effect* . . . ." *Stidham v. Whelchel*, 698 N.E.2d 1152, 1154 (Ind. 1998) (emphasis added) (quoting 46 Am. Jur. 2d *Judgments* § 31 (2006)). Yet the Garwoods believe this means the jeopardy assessments "literally never happened," Tr. p. 625 — as a matter of *fact* and *history*, such that the documents themselves could not even be admitted into evidence because they were "blank pieces of paper" in the eyes of the law. *Id.* at 624. This is incorrect.

[109] "Voidness" is a concept of the law of procedure that has precisely one legal consequence: what is void may be collaterally attacked at any time by any person, or, what amounts to the same thing, cannot be enforced under any circumstances, waiver, consent, ratification, or procedural default notwithstanding.

> A void judgment is . . . , from its inception, . . . a complete nullity and without legal effect. By contrast, a voidable judgment is not a nullity, and is capable of confirmation or ratification. Until superseded, reversed, or vacated, it is binding, enforceable, and has all the ordinary attributes and consequences of a valid judgment. . . . [Judgments rendered in the absence of personal

jurisdiction must be void rather than voidable. If only voidable, a] plaintiff would be able to obtain a default judgment after serving process upon any party, no matter how remote, and place the burden on that party to seek to eradicate the record within a reasonable time or [by operation of procedural default or waiver] run the risk that a valid judgment may be outstanding in the plaintiff's choice of forum where it may become quite important at some indeterminate time in the future even if insignificant today. This result [is unacceptable] . . . .

*Stidham*, 698 N.E.2d at 1154-55 (citations and quotations omitted); *see also* Restatement (Second) of Judgments ch. 5, intro. note (Am. Law Inst. 1982) ("[I]t is said that a 'void' judgment is vulnerable either to direct or collateral attack, while a 'voidable' judgment is subject only to direct attack."); 50 C.J.S. *Judgments* § 710 (2009) ("[A] judgment which is not void is not subject to collateral attack, but a void judgment may be attacked at any time by any person in any proceeding."); 46 Am. Jur. 2d *Judgments* § 738 (2006) ("[A] collateral attack may [only] be allowed if the judgment is void . . . ."). The same is true, for example, for marriages, *Pry v. Pry*, 255 Ind. 458, 75 N.E.2d 909 (1947), and for contracts. *Montgomery v. Wasem*, 116 Ind. 343, 15 N.E. 795, 797 (1888).

[110] We do not read *Garwood II* to hold that the Garwoods would have been entitled simply to default on a direct challenge to the jeopardy assessments and collaterally attack future execution, because that was not the question before the tax court in *Garwood II*. The question before the tax court was simply whether the jeopardy assessments were erroneous, not whether such error rendered the assessments void or merely voidable.

[111] Even if this were precisely what the tax court held, what the tax court never did, purported to do, or could conceivably do, was to blot out the jeopardy assessments from the book of life. "You cannot change history," as the State correctly observed. Tr. p. 626. As already discussed, *see supra* Part II, a state procedural rule cannot blind the federal constitution to objective reality. Neither does the law of this state blinker itself:

> Brooks confessed a judgment before a justice of the peace . . . . [Defendant, a constable, was issued a writ of execution on the judgment, and under that writ levied on Brooks' property. Plaintiff, a sheriff, obtained separate writs from the circuit court and levied on the same property.] The defendant, notwithstanding, re-took the property and sold it on the execution. . . .
>
> It is contended [by the plaintiff sheriff] that [an applicable] statute rendered the confessed judgment a nullity as to all persons not a party to it; and, therefore, the [defendant] constable committed a trespass in proceeding to sell the goods which he had seized . . . .
>
> The premiss may be true, *but the inference is not correct*. The question here is not, whether the regular execution-creditors of Brooks had any means of avoiding their regular judgment confessed before the justice; but the inquiry is, whether the defendant was justified in executing the writ, under which he acted. That writ . . . [was facially regular]. *The law is, that a writ, having these characteristics, however irregularly issued, even though there be no judgment on which to found it, is a justification to an officer acting under it.*

*Gott v. Mitchell*, 7 Blackf. 270, 270–71 (Ind. 1844) (emphasis added).

Though the tendered jury instruction correctly stated the law, it was inapplicable to this case, risked misleading the jury, and could not have changed the federal- or state-law result. For these reasons, the trial court did not abuse its discretion by failing to give the Garwoods' tendered instruction on voidness. For the same reasons, the trial court did not abuse its discretion in ruling that the jeopardy assessments were not "blank pieces of paper," Tr. p. 624, but admissible evidence.

# Conclusion

The judgment against Swain is reversed. The order as to fees and costs is vacated. The trial court is affirmed in all other respects.

Reversed in part and affirmed in part.

Baker, J., and Pyle, J., concur.