## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

May 28 2020, 5:50 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT
A.C. (MOTHER)
Anthony C. Lawrence
Anderson, Indiana

ATTORNEY FOR APPELLANT
M.B. (FATHER)
Cara Schaefer Wieneke
Wieneke Law Office, LLC
Brooklyn, Indiana

ATTORNEY FOR APPELLEE
Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the
Parent-Child Relationship of
A.B. (Minor Child) and

A.C. (Mother) and

M.B. (Father),

*Appellants-Respondents,*

v.

Indiana Department of Child
Services,

*Appellee-Petitioner.*

May 28, 2020

Court of Appeals Case No.
19A-JT-2537

Appeal from the Henry Circuit
Court

The Honorable Bob A. Witham,
Judge

Trial Court Cause No.
33C01-1906-JT-52

**Mathias, Judge.**

[1] A.C. ("Mother") and M.B. ("Father") (collectively "the Parents") challenge the order of the Henry Circuit Court terminating their parental rights to their minor child A.B. ("Son"). On appeal, the Parents present two arguments, which we reorder and restate as: (1) whether there was sufficient evidence to support the trial court's termination order, and (2) whether fundamental error occurred because the Parents' procedural and substantive due process rights were violated by the failure of the Indiana Department of Child Services ("DCS") to provide the Parents with services.

[2] We affirm.

## Facts and Procedural History

[3] The facts favorable to the trial court's judgment reveal that, prior to Son's birth in 2017, both Parents had a history of drug abuse and criminal behavior.

### I. Mother's History Prior to Son's Birth

[4] Mother has used illicit drugs since the age of thirteen. She has a history of DCS involvement: her two other children were removed from her care and placed with Mother's father. Mother's criminal history prior to Son's birth includes the following: in May 2005, Mother was charged with dealing a schedule II controlled substance and a schedule IV controlled substance. The trial court in that case ordered Mother to be treated at a methadone clinic because she was pregnant at the time. In March 2007, Mother pleaded guilty and was sentenced

to concurrent terms of five years on both counts, with two years on home detention and three years suspended. Mother violated the terms of her probation in that case twice, resulting in her serving time in jail. In December 2014, Mother was charged with theft and ultimately pleaded guilty to Level 6 felony theft. Mother was sentenced to one year executed in community corrections.

## II.    Father's History Prior to Son's Birth

[5]     Father too has a history of involvement with DCS with a previously born child. Father has a long history of substance abuse and resulting criminal behavior. In November 2010, Father was charged with two counts of Class D felony domestic battery, to which he pleaded guilty in February 2011. He was sentenced to time served. In July 2012, Father was arrested and charged with Class B felony dealing in cocaine or a narcotic drug, Class D felony maintaining a common nuisance, and two counts of Class A misdemeanor maintaining a common nuisance endangering a minor. In September 2013, Father pleaded guilty to the dealing count and was sentenced to eight years of incarceration.

### III. The Parents' Relationship and Son's Birth

[6] Mother and Father began dating in 2016, and Mother became pregnant with Son. During her pregnancy, Mother used Subutex,[1] for which she claimed to have a prescription. She was also charged with Class A misdemeanor operating while intoxicated endangering a person, Class C misdemeanor operating with a schedule I or II substance in a person's body, and Class B misdemeanor public intoxication. Mother pleaded guilty in March 2018 to the Class A misdemeanor and was sentenced to one year suspended to probation.

[7] Son was born on August 12, 2017, and he tested positive for buprenorphine at birth. Son was removed from the Parents' care while he was still in the hospital. DCS filed a petition alleging that Son was a child in need of services ("CHINS") on August 17, 2017. Both Parents subsequently admitted that Son was in need of services, and the trial court issued an order finding son to be a CHINS on August 31, 2017.

[8] On October 16, 2017, the trial court issued a dispositional order requiring the Parents to, among other things, enroll and participate in all referred services and assessments; undergo parenting, substance abuse, and domestic violence assessments; successfully engage in and complete all recommended treatments and recommended services; obtain and maintain safe and stable housing; secure

---

[1] Subutex is a brand name for buprenorphine, an opioid partial agonist-antagonist medication used to treat opioid dependence. *See* Buprenorphine Sublingual and Buccal (opioid dependence), Medline Plus, https://medlineplus.gov/druginfo/meds/a605002.html (last visited May 12, 2020) [https://perma.cc/BPL7-X2TC].

a legal source of income; refrain from using illicit drugs or controlled substances unless prescribed by a physician; submit to random drug screens; not commit any crimes; and participate in home-based counseling.

### IV.  Mother's Behavior During the CHINS Case

[9]     After Son's birth, DCS helped Mother get into an inpatient treatment center, but Mother left after only five days, after which she continued her criminal behavior. On August 21, 2017, just days after giving birth to Son, Mother was charged with Class A misdemeanor possession of a controlled substance and Class B misdemeanor public intoxication. She pleaded guilty to the Class A misdemeanor possession charge on March 13, 2018, and was sentenced to one year in home detention. Less than a month later, on April 4, 2018, the State filed a petition to revoke Mother's placement. Mother was arrested and admitted to the violation. The trial court revoked her placement and ordered her to serve the balance of her sentence in jail.

[10]    In October 2017, Mother was again arrested and charged with Class A misdemeanor possession of a controlled substance, Class B misdemeanor possession of marijuana, and Class B misdemeanor public intoxication. Mother pleaded guilty to the possession charges in February 2018. The trial court released her to inpatient drug treatment and sentenced her the following month to one year suspended to probation.

[11]    In September 2018, Mother was charged with Level 5 felony possession of methamphetamine, Class B misdemeanor possession of marijuana, Class C

misdemeanor possession of paraphernalia, and Class A misdemeanor possession of marijuana with a prior conviction. Mother pleaded guilty to the felony possession charge in November 2018 and was sentenced to six years of incarceration, with one year suspended to probation. Because of her unabated criminal behavior, Mother was incarcerated at various times during the CHINS case, and she was still incarcerated at the time of the termination hearing.[2] As a result, DCS was unable to offer many services to Mother. She participated in approximately six or eight visitations with Son. And she tested positive for buprenorphine on two occasions in June 2018.

### V. Father's Behavior During the CHINS Case

On November 3, 2017, Father was charged with Level 6 felony maintaining a common nuisance and Class C misdemeanor driving with a false certificate of registration. He pleaded guilty in June 2018 to the Level 6 felony and was sentenced to 452 days in jail. Because of his continued criminal conduct, Father was also incarcerated throughout most of the CHINS case, including at the time of the termination hearing.[3]

On November 16, 2017, Father was charged with Level 5 felony possession of methamphetamine, Level 6 felony possession of methamphetamine, Level 6 felony unlawful possession of syringe, Level 6 felony maintaining a common nuisance, Class B misdemeanor possession of marijuana, and Class C

---

[2] Mother's earliest possible release date is March 14, 2023.

[3] Father's earliest possible release date is August 17, 2020.

misdemeanor possession of paraphernalia. Father pleaded guilty in May 2018 to Level 5 felony possession of methamphetamine and was sentenced to five years with three years suspended.

[14] Father has been incarcerated since November 2017 and has therefore been unable to provide any assistance to Son. DCS maintained contact with Father while he was in prison and arranged for him to participate in the "Fatherhood Engagement" program in prison. The DCS Family Case Manager ("FCM") assigned to Son's case spoke with Father twice. During the first conversation, Father screamed at the FCM and was subsequently disciplined in jail for his behavior. During their second conversation, Father hung up on the FCM when the FCM told Father that Son's permanency plan had been changed to adoption and that termination of his parental rights was possible. Father also refused to sign for court reports while incarcerated. Due to Father's incarceration, DCS was unable to provide Father with services.

## VI. Termination Proceedings

[15] On June 10, 2019, DCS filed a petition to terminate the Parents' parental rights. The court held an evidentiary hearing on the termination petition on September 9, 2019. On October 3, 2019, the trial court entered an order, accompanied by findings of fact and conclusions of law, terminating the Parents' parental rights. This order provides in relevant part:

> 22. [Mother] has participated in various aspects of substance abuse treatment, including the Henry County Drug Court; intensive outpatient therapy at Meridian Services in 2008; and

inpatient treatment at the Anderson Center at age 16 and the ARC in Richmond, IN, in November of 2018.

23. [Mother] relapsed into substance abuse disorder after each of her involvements with treatment and reports that her longest period of sobriety since age 13 has been six (6) months.

24. Neither [Mother] nor [Father] has a firm offer of employment upon his/her release from incarceration, although both have investigated possibilities of post-release work.

25. The Department offered [Mother] treatment through intensive outpatient therapy, which she declined.

26. The Department offered [Mother] supervised visitation with [Son] which she accessed inconsistently prior to her incarceration.

27. The Department offered to engage [Mother] and [Father] in several family team meetings which resulted in either cancellations or becoming case staffings due to the parents' failure to appear or participate.

28. [Court Appointed Special Advocate ("CASA")] reports that [Son] is a happy, affectionate and well-adjusted child in his current relative placement home where he is considered to be a member of the family.

29. CASA expressed significant concern about disrupting the child's relative placement at this time, believing that disruption would be an additional trauma the child would be forced to overcome.

30. Both the Department of Child Services and CASA suggest that it is in [Son]'s best interest that the parent-child relationship be severed and that he be placed for adoption with the current relative placement.

The child has been removed from his parent(s) for at least six (6) months under a disposition decree of the Henry Court, dated October 5, 2017 in cause number 33C01-1708-JC-000096.

The child has been removed from his parent(s) and has been under the supervision of the Indiana Department of Child Services or the county probation department for at least fifteen (15) of the last twenty-two (22) months.

There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for the placement outside the parent's home will not be remedied in that:

1. Both parents are currently unavailable to parent the child due to incarceration;

2. Both parents have a substantial criminal conviction history, with convictions occurring both before and after the birth of the child.

3. [Father], on at least two occasions during the pending CHINS investigation and case, presented oral swab samples that later tested positive for methamphetamine, amphetamine and THC after having arrived at the testing laboratory in substantially the same condition as at the time when [Father] provided the samples and they were sealed into testing shipment containers in his presence.

4. [Mother] has struggled with substance abuse disorder since she was thirteen (13) years old and represents that her most extensive period of sobriety as an adult is six (6) months.

5. Neither parent has taken full advantage of the services that the Department of Child Services has offered.

Termination is in the child's best interests of the child [sic] in that it will secure for the child a permanent and stable family relationship with the only "parents" the child has ever known rather than having him wait for one of his parents to be released

from imprisonment perchance that that parent can maintain his/her liberty and sobriety sufficiently to establish a safe, nurturing home for [Son].

The Department of Child Services has a satisfactory plan for the care and treatment of the child, which is adoption by the current placement family.

Appellant's App. pp. 34–35. The Parents now appeal.

## Termination of Parental Rights

[16] Indiana Code section 31-35-2-4(b)(2) provides that a petition to terminate parental rights must allege:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

[17] DCS must prove each element by clear and convincing evidence. Ind. Code § 31-37-14-2; *In re G.Y.*, 904 N.E.2d 1257, 1260 (Ind. 2009). But because Indiana Code subsection 31-35-2-4(b)(2)(B) is written in the disjunctive, the trial court is

required to find that only one prong of subsection 4(b)(2)(B) has been established by clear and convincing evidence. *In re A.K.*, 924 N.E.2d 212, 220 (Ind. Ct. App. 2010), *trans. dismissed*.

[18] Clear and convincing evidence need not establish that the continued custody of the parent is wholly inadequate for the child's very survival. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 148 (Ind. 2005). It is instead sufficient to show by clear and convincing evidence that the child's emotional and physical development are put at risk by the parent's custody. *Id.* If the court finds the allegations in a petition are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[19] The purpose of terminating parental rights is not to punish parents but instead to protect their children. *In re S.P.H.*, 806 N.E.2d 874, 880 (Ind. Ct. App. 2004). Although parental rights have a constitutional dimension, the law allows for their termination when the parties are unable or unwilling to meet their responsibilities as parents. *Id.* Indeed, parental interests must be subordinated to the child's interests in determining the proper disposition of a petition to terminate parental rights. *In re G.Y.*, 904 N.E.2d at 1259.

## Standard of Review

[20] Indiana appellate courts have long had a highly deferential standard of review in cases involving the termination of parental rights. *In re D.B.*, 942 N.E.2d 867, 871 (Ind. Ct. App. 2011). We neither reweigh the evidence nor assess witness credibility. *Id.* We consider only the evidence and reasonable inferences

favorable to the trial court's judgment. *Id.* In deference to the trial court's unique position to assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Clear error is that which leaves us with a definite and firm conviction that a mistake has been made. *J.M. v. Marion Cty. Office of Family & Children*, 802 N.E.2d 40, 44 (Ind. Ct. App. 2004), *trans. denied*.[4]

## I. Sufficiency of the Evidence

[21] Parents argue that the trial court clearly erred in determining that DCS presented sufficient evidence to terminate their parental rights.

### A. Findings of Fact

[22] The Parents challenge two of the trial court's findings of fact as clearly erroneous. The first challenged finding states:

> 5. The Court found [Son] to be a Child in Need of Services on August 31, 2017, after Mother, Father and Custodian all admitted that [Son] was in need of services due to Mother's addictions and the Court's intervention [was needed] to ensure he received those services.

Appellant's App. p. 33. The Parents contend that this finding was not supported by any evidence in the record. We disagree.

---

[4] We also note that the Parents challenge only two of the trial court's factual findings as being clearly erroneous. We therefore accept the trial court's other findings as true. *In re A.M.*, 121 N.E.3d 556, 562 (Ind. Ct. App. 2019), *trans. denied*).

[23] The State submitted into evidence a copy of the chronological case summary from the CHINS case, which contains an entry stating:

> Hearing Journal Entry (Judicial Officer : Witham, Bob A)
> Hearing Date: 08/31/2017
> *Appearances : DCS FCM. Kayla Miller; Attorney, Deborah Reasoner; Mother, []:*
> *Attorney, Jeff Galyen; Father, []; Attorney, Joe Lansinger; CASA. Pre-trial Conference held.* **ADMISSION entered and factual basis established as to both parents.** *Child is adjudicated a CHINS. DCS to prepare a PDR. Dispositional Hearing 10-5-17 at 10:45 a.m.*

Ex. Vol. p. 71 (italics in original, bold emphasis added). In addition, Mother testified at the termination hearing that she had previously admitted that Son was a CHINS due to her substance abuse problems. Tr. p. 89. This is sufficient to support the trial court's finding of fact No. 5.

[24] The Parents next contend that finding of fact No. 24 is clearly erroneous. This finding states:

> 24. Neither [Mother] nor [Father] has a firm offer of employment upon his/her release from incarceration, although both have investigated possibilities of post-release work.

Appellant's App. p. 34. Despite the Parents' argument that this finding is clearly erroneous, the facts favoring the trial court's judgment, and the reasonable inferences that may be drawn from this evidence, support the trial court's finding.

Father testified that he had a "job lined up," explaining that he could "go right back to work to Foam Rubber where I was working at before I got arrested." Tr. p. 133. He continued, "I also got Mr. Yocky I was working for and he will take me back in a heartbeat." *Id.* The trial court was not obligated to credit Father's testimony.[5] And even if the trial court believed this testimony, it does not establish that Father had a "firm offer" of employment. It establishes that Father believed he could get a job after his release.

With regard to her employment prospects, Mother testified that she had "a job when I get out," but explained that this was at "TS Tech," where she had worked for approximately three months prior to her incarceration and had been told that she could "have [her] job back." Tr. p. 107. Again, the trial court was not required to believe Mother's testimony. And Mother also admitted that her substance abuse problems had cost her jobs in the past. Therefore, the trial court was under no obligation to consider Mother's testimony as evidence of a "firm offer" of employment. More importantly, even if this finding of fact was clearly erroneous, it would not alter our ultimate conclusions, as the trial court's conclusions were not based solely on the Parents' lack of employment.

### B. Conditions that Resulted in Child's Removal

The Parents next argue that the trial court erred by concluding that there was a reasonable probability that the conditions that resulted in Son's removal from

---

[5] The trial court was under no obligation to believe the Parents' testimony, even if uncontradicted. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004) ("As a general rule, factfinders are not required to believe a witness's testimony even when it is uncontradicted.").

their care, or the reasons for Son's continued placement outside the Parents' home, would not be remedied. When deciding whether there is a reasonable probability that the conditions resulting in a child's removal or continued placement outside of a parent's care will not be remedied, the trial court must determine a parent's fitness to care for the child at the time of the termination hearing while also taking into consideration evidence of changed circumstances. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156–57 (Ind. Ct. App. 2013), *trans. denied*. The trial court may disregard efforts made only shortly before termination and give more weight to a parent's history of conduct prior to those efforts. *In re K.T.K.*, 989 N.E.2d 1225, 1234 (Ind. 2013).

[28]     Here, the condition that led to Son's removal was Mother's substance abuse. And the reason for his continued placement outside the home was the Parents' continued substance abuse and criminal behavior. The Parents argue that they have maintained sobriety during their incarceration and that the conditions that led to Son's removal no longer exist. But Mother has a long history of drug use and admitted that her longest period of sobriety had been only six months. She testified that she "lost it" after Son's removal, and she was repeatedly incarcerated on drug-related offenses during the CHINS case. Tr. p. 86. Indeed, throughout this case and her previous CHINS case with her other children, Mother continued in a pattern of relapse and incarceration. Tr. p. 117. And Father had a history of drug use and incarceration for drug-related offenses. During this case, he tested positive for methamphetamine, and was incarcerated for nearly the entire CHINS case on a drug-related offense.

The trial court could reasonably conclude that the Parents would continue in this behavior unabated once they were released from incarceration. In short, the trial court did not clearly err by concluding that there was a reasonable probability that the conditions that resulted in Son's removal from their care, or the reasons for Son's continued placement outside the Parents' home, would not be remedied.

### C. Best Interests of the Child

The Parents also claim that the trial court erred in concluding that termination of their parental rights was in Son's best interests. In determining what is in the best interests of a child, the trial court must look to the totality of the evidence, beyond the factors identified by DCS. *A.D.S.*, 987 N.E.2d at 1158. The trial court must subordinate the interests of the parent to those of the child and need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* A recommendation by the case manager or a child advocate, such as a guardian ad litem, to terminate parental rights is sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.* at 1158–59.

"A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that termination of the parent-child relationship is in the child's best interests." *In re A.K.*, 924 N.E.2d at 221 (citing *Castro v. State Office of Family and Children*, 842 N.E.2d 367, 374 (Ind. Ct. App. 2006), *trans. denied*). A child's need

for permanency is a "central consideration" in determining the best interests of a child. *In re G.Y.*, 904 N.E.2d at 1265.

[32] Here, Son's FCM testified that it was his opinion that termination of the Parents' parental rights was in the best interests of Son. The CASA for Son testified similarly that it was in Son's best interests for the Parents' parental rights to be terminated. The evidence favorable to the trial court's judgment supports their testimony. Father had been incarcerated during most of the CHINS case and had never been able to provide for Son. Mother was frequently incarcerated during the CHINS case and also had never been able to provide for Son. Even before the Parents were incarcerated, they were "transient" and hard for DCS to contact. And Son has done well in foster care, where he is considered a member of the family and well bonded. The foster parents are the only parents Son has ever known, and to remove him from that environment would be traumatic to him. Thus, there was sufficient evidence to support the trial court's conclusion that termination of the Parents' parental rights was in the best interests of Son.

## II.  Denial of Due Process

[33] Mother also contends that DCS violated her due process rights during the CHINS case and termination proceedings. She claims that there was no reasonable effort to reunify the family, specifically referring to the fact that DCS had multiple family case managers assigned to this particular case, the "chaotic approach to her case," and a general lack of communication and coordination. Mother's Appellant's Br. at 15. This, Mother claims, created a serious risk of

error by the State and therefore constitutes fundamental error. Father makes a similar argument, claiming that DCS violated his due process rights by failing to make reasonable efforts to reunify him with Son by not establishing any visitation with Son during the CHINS case.

[34] Neither party presented their due process arguments to the trial court. It is axiomatic that an argument cannot be presented for the first time on appeal. *Ind. Bureau of Motor Vehicles v. Gurtner*, 27 N.E.3d 306, 311 (Ind. Ct. App. 2015). "[A]ppellate review presupposes that a litigant's arguments have been raised and considered in the trial court." *Plank v. Cmty. Hospitals of Ind., Inc.*, 981 N.E.2d 49, 53 (Ind. 2013). Because the Parents did not present their due process argument to the trial court, this argument is waived for purposes of appeal. *See id.*

[35] The Parents argue that we should nevertheless consider their arguments under the fundamental error doctrine. We explained the fundamental error doctrine in *N.C. v. Indiana Dep't of Child Servs.*, as follows:

> The fundamental error doctrine is a narrow exception to the waiver doctrine and applies to an error that was so egregious and abhorrent to fundamental due process that the trial judge should or should not have acted, irrespective of the parties' failure to object or otherwise preserve the error for appeal. For our court to overturn a trial court ruling based on fundamental error, the error must have been a clearly blatant violation of basic and elementary principles, and the harm or potential for harm therefrom must be substantial and appear clearly and prospectively.

56 N.E.3d 65, 69 (Ind. Ct. App. 2016) (citations and internal quotation marks omitted), *trans. denied*.[6] Our courts have applied the fundamental error doctrine in termination cases. *S.M. v. Elkhart Cty. Office of Family & Children*, 706 N.E.2d 596, 599 (Ind. Ct. App. 1999).

[36]     We disagree with the Parents that DCS's alleged failure to make reasonable efforts to reunify the family violated their due process rights. "Parental rights constitute an important interest warranting deference and protection, and a termination of that interest is a 'unique kind of deprivation.'" *In re C.G.*, 954 N.E.2d 910, 916–17 (Ind. 2011) (quoting *Lassiter v. Dept. of Soc. Servs.*, 452 U.S. 18, 27 (1981)). Children also have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships. *Id.* at 917. (citing *Lehman v. Lycoming County Children's Servs. Agency*, 458 U.S. 502, 513 (1982)). Thus, when the State seeks to terminate the parent-child relationship, it must do so in a manner that meets the requirements of due process. *Id.*

[37]     Our supreme court has explained that "the process due in a termination of parental rights action turns on balancing three *Mathews*[7] factors: (1) the private

---

[6] To the extent that the Parents argue that DCS violated their due process rights by failing to abide by the relevant statutes, this argument is misplaced. A violation of state law does not establish a due process violation. *Garwood v. State*, 77 N.E.3d 204, 220 (Ind. Ct. App. 2017), *trans. granted*, *aff'd in relevant part* 84 N.E.3d 624 (Ind. 2017) (citing *Charleston v. Bd. of Trustees*, 741 F.3d 769, 773 (7th Cir. 2013) ("[W]e will be clear once more: a plaintiff does not have a federal constitutional right to state-mandated process."); *Ind. Land Co. v. City of Greenwood*, 378 F.3d 705, 711 (7th Cir. 2004) ("[A]n error of state law is not a violation of due process.")).

[7] *Mathews v. Eldridge*, 424 U.S. 319 (1976).

interests affected by the proceeding; (2) the risk of error created by the State's chosen procedure; and (3) the countervailing governmental interest supporting use of the challenged procedure." *In re K.D.*, 962 N.E.2d 1249, 1257 (Ind. 2012) (citing *In re C.G.*, 954 N.E.2d at 917). As recognized in *In re C.G.,* in termination cases, both the State and the parent have substantial interests affected by the proceedings. 954 N.E.2d at 917–18. We therefore focus on the risk of error created by DCS's actions and the trial court's actions. *Id.* at 918.

[38] We have held before that numerous procedural irregularities in a CHINS proceeding can amount to a deprivation of due process. *In re A.P.*, 734 N.E.2d 1107, 1112–13 (Ind. Ct. App. 2000), *trans. denied*. In *In re A.P.,* the procedural irregularities included: the parents not being provided copies of the case plan; the lack of the required allegations in the termination petition; the failure of the trial court to hold a permanency hearing; the denial of the father's right to be present at the hearings; and the lack of statutorily required findings in the trial court's orders. *Id.* at 1114–17. We held that these irregularities deprived the parents of due process. *Id.* at 1117. Nothing like this occurred in the present case.

[39] Still, the Parents insist that their due process rights were violated by DCS's failure to provide services to assist in reunifying the family. We have repeatedly rejected similar arguments. In *In re J.W., Jr.*, 27 N.E.3d 1185, 1190 (Ind. Ct. App. 2015), *trans. denied,* we summarized our case law in this area:

> The Indiana Supreme Court has long recognized that, in "seeking termination of parental rights," the DCS has no

obligation "to plead and prove that services have been offered to the parent to assist in fulfilling parental obligations." *S.E.S. v. Grant Cnty. Dep't of Welfare*, 594 N.E.2d 447, 448 (Ind. 1992). Likewise, we have stated on several occasions that, although "[t]he DCS is generally required to make reasonable efforts to preserve and reunify families *during the CHINS proceedings*," that requirement under our CHINS statutes "is not a requisite element of our parental rights termination statute, and a failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law." *A.Z. v. Ind. Dep't of Child Servs. (In re H.L.)*, 915 N.E.2d 145, 148 & n.3 (Ind. Ct. App. 2009) (emphasis added) (citing I.C. § 31-34-21-5.5); *see also Elkins v. Marion Cnty. Office of Family & Children (In re E.E.)*, 736 N.E.2d 791, 796 (Ind. Ct. App. 2000) ("even a complete failure to provide services would not serve to negate a necessary element of the termination statute and require reversal."); *Stone v. Daviess Cnty. Div. of Children & Family Servs.*, 656 N.E.2d 824, 830 (Ind. Ct. App. 1995) ("under Indiana law, even a complete failure to provide services cannot serve as a basis to attack the termination of parental rights."), *trans. denied*.

Under this precedent, it is clear that DCS's alleged failure to provide the Parents services cannot act as a basis to attack a termination order.

[40]   Moreover, the underlying reason DCS was unable to provide the Parents with services was the fact that, during the CHINS case, both Parents were repeatedly incarcerated. *See In re H.L.*, 915 N.E.2d at 148 (holding that DCS's inability to provide father with services, which was due to his incarceration, did not amount to a denial of due process) (citing *Castro*, 842 N.E.2d at 377 (same)); *see also Rowlett v. Vanderburgh Cty. Office of Family & Children*, 841 N.E.2d 615, 622 (Ind. Ct. App. 2006) (noting that the Office of Family and Children was not

required to provide father with services directed at reuniting him with his children while he was incarcerated), *trans. denied*.

[41] We find the Parents' citation to *In re T.W.*, 135 N.E.3d 607, 609 (Ind. Ct. App. 2019), *trans. denied*.,[8] to be unavailing. In that case, a panel of this court held *sua sponte* that

> for a parent's due process rights to be protected in the context of termination proceedings, DCS must have made reasonable efforts to preserve and/or reunify the family unit in the CHINS case (unless the no reasonable efforts exception applies). What constitutes "reasonable efforts" will vary by case, and . . . *it does not necessarily always mean that services must be provided to the parents*.

*Id.* at 615 (emphasis added).

[42] The facts in *In re T.W.* are quite different than those presented here. In that case, the father was incarcerated when his child was born. Even before the child was born, Father proactively contacted DCS, acknowledged paternity, requested assistance, and asked that the child be placed with his mother. Approximately one year after the child's birth, father was released from incarceration. Thereafter, he consistently attempted to engage with DCS and participate in reunification services. Despite this, DCS failed to assist father in his attempt to establish paternity, failed to inform him about scheduled drug screens, set up

---

[8] DCS notes that, at the time the parties filed their briefs, the opinion in *In re T.W.* was not yet certified, and a petition to transfer was pending. Our supreme court subsequently denied transfer. *See T.K. v. Indiana Dep't of Child Servs.*, 2020 WL 1166859 (Ind. Mar. 5, 2020).

and then cancelled visitations without father's knowledge, and failed to refer father to a parent aide. Under these facts and circumstances, the *In re T.W.* court concluded: "DCS did not make reasonable efforts to reunify Father with Child. Likewise, we can only conclude that the insufficient process employed in the CHINS case created a risk of the erroneous filing of a petition to terminate Father's parental rights to Child, in violation of Father's due process rights." *Id.* at 618.

[43]　　In contrast, here, neither parent diligently sought services in a manner similar to the father in *In re T.W.* To the contrary, Mother abruptly left the inpatient treatment center that DCS had helped her get into. She participated in only a few visits with Son, and she tested positive for buprenorphine on two occasions in June 2018. Mother was repeatedly arrested and incarcerated throughout the CHINS proceedings and was incarcerated at the time of the termination hearing. Father's behavior during the CHINS case followed a similar course. After he was sentenced to prison, DCS arranged for him to participate in a fatherhood program while incarcerated. But Father was uncooperative and unreceptive to attempts by the FCM to engage him in services. Father also refused to sign for court reports while in prison. This stands in stark contrast to the behavior of the father in *In re T.W.* Therefore, unlike the court in *In re T.W.*, we do not think that the DCS's behavior during the CHINS case created a "risk of the erroneous filing of a petition to terminate [the Parents'] parental rights to [Son], in violation of [the Parents'] due process rights. *Id.* at 614.

# Conclusion

[44] The trial court did not clearly err in concluding that there was a reasonable probability that the conditions that resulted in Son's removal from the Parents' care, or the reasons for Son's continued placement outside the Parents' home, would not be remedied and that termination of the Parents' parental rights was in the best interests of Son. Furthermore, DCS did not violate the Parents' due process rights by failing to provide services. We therefore affirm the judgment of the trial court.

[45] Affirmed.

Riley, J., and Tavitas, J., concur.